UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE NOKIA OYJ (NOKIA CORP.)
SECURITIES LITIGATION

Case No. 04-CV-2646 (KMK)

<u>OPINION AND ORDER</u>
(ECF Case)

<u>Appearances:</u>

Beth A. Kaswan, Esq.
Sanford P. Dumain, Esq.
Beth Parr, Esq.
Milberg, Weiss, Bershad & Schulman, LLP
New York, New York
*Counsel for Plaintiffs*

Vincent R. Cappucci, Esq.
Entwistle & Cappucci, LLP
New York, New York
*Counsel for Plaintiffs*

Kenneth M. Kramer, Esq.
Jerome S. Fortinsky, Esq.
Seth M. Kean, Esq.
Nicole Coward, Esq.
Shearman & Sterling, LLP
New York, New York
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

This securities class action was brought by persons who purchased Nokia Corporation

("Nokia") American Depository Receipts ("ADRs") or foreign shares from October 16, 2003 to

April 15, 2004 (the "Class Period"). The Consolidated Amended Class Action Complaint

("Consolidated Amended Complaint" or "CAC") alleges that Defendants, Nokia and a number of

its officers – Jorma Ollila ("Ollila"), Pekka Ala-Pietila, Matti Alahuhta, Richard A. Simonson, Olli-Pekka Kallasvuo ("Kallasvuo"), and Anssi Vanjoki ("Vanjoki") – violated Section 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the Exchange Act") and Rule 10b-5 promulgated thereunder. Defendants move to dismiss the Consolidated Amended Complaint for failure to state a claim upon which relief may be granted, pursuant to Fed. R. Civ. P. 12(b)(6), and for failure to plead fraud with sufficient particularly as required by Fed. R. Civ. P. 9(b). For the reasons set forth below, Defendants' Motion to Dismiss is GRANTED and the Consolidated Amended Complaint is dismissed.

## I. BACKGROUND

### A. Nokia's Relevant Financial History

Unless where otherwise indicated, the following facts are taken from the Consolidated Amended Complaint and do not constitute findings of the Court.

Nokia, a Finnish corporation, is one of the world's leading cell phone manufacturers. For the fiscal year of 2003, Nokia's net sales totaled $37.1 billion and its net profits totaled $4.5 billion. The company has approximately 50,000 employees, maintains production facilities in nine countries, and sells a variety of communication devices in over 130 countries. Nokia is a publicly held company whose stock is primarily traded on the Helsinki Exchange, and the New York Stock Exchange (where approximately sixty percent of Nokia's securities are traded), in the form of ADRs. Nokia shares were also listed throughout the Class Period on the Frankfurt, Stockholm, and Paris stock exchanges and were traded on the London stock exchange until November 2003.

Nokia's communication devices operate using three major digital transmission

technologies: Time Division Multiple Access ("TDMA"), Global System for Global Communications ("GSM"), and Code Division Multiple Access ("CDMA"). Nokia also introduced a gaming device, the "N-Gage" in late 2003.

During all relevant periods, Jorma Ollila was Nokia's Chairman of the Board and Chief Executive Officer, Pekka Ala-Pietila was Nokia's President and an Executive Board Member, Matti Alahuhta was Nokia's Executive Vice President, Chief Strategy Officer, and an Executive Board Member. Beginning January 1, 2004, Richard A. Simonson was Nokia's Chief Financial Officer and an Executive Board Member. Olli-Pekka Kallasvuo preceded Simonson as Nokia's CFO and was also Nokia's Executive Vice President, General Manager of Mobile Phones Division, and an Executive Board Member. During the Class Period, Anssi Vanjoki was a Nokia Executive Vice President, General Manager of its Multimedia Division, and an Executive Board Member. The class, represented by Generic Trading of Philadelphia, LLC, Martin Bergljung, and Gerald Hoberman, consists of parties who purchased Nokia's common stock during the Class Period.

From October 2003 through March 2004, Nokia reported growth in its cell phone market share and made projections of expected increases in cell phone sales of three to seven percent for the first quarter of 2004 as well as increases in its earnings per share. Nokia attributed its success for the fourth quarter of 2003 to Nokia's purported superior products, healthy Average Sale Price ("ASP"), and growing market share. Plaintiffs allege, however, that Nokia's increased cell phone sales and its positive stock performance in the fourth quarter of 2003 were an aberration that was not driven by Nokia, but by a massive surge in consumer demand for cell phones that caused component shortages for Nokia's competitors, thereby suppressing their sales and

benefitting Nokia.

During this fourth quarter upsurge in Nokia's performance, the Consolidated Amended Complaint alleges that Defendants were aware of various factors that would negatively impact Nokia's financial results. In contravention of applicable securities laws, however, Defendants failed to disclose this information to investors and actively misled investors by claiming Nokia's strategy was responsible for Nokia's aberrant positive performance in the fourth quarter of 2003 and projected growth of three to seven percent in the first quarter of 2004.

Despite industry-wide growth, on April 6, 2004, Defendants made a pre-quarterly announcement that sales had declined by two percent during the first quarter of 2004. On the day following this announcement, Nokia shares fell sixteen percent, a single day market capitalization loss of $17 billion. Ten days later, on April 16, 2004, Defendants released Nokia's first quarter 2004 financial statements which showed a fifteen percent decrease in sales of its core cell phone business and stated that Nokia's sales would continue to be depressed in the next few quarters. The April 16, 2004 revelations caused Nokia's stock to drop an additional nine percent in one day, an $8 billion loss in market capitalization.

B.  The Consolidated Amended Complaint

The Consolidated Amended Complaint alleges that Defendants made several materially misleading statements throughout the Class Period related to the strength of Nokia's product portfolio, Nokia's product pipeline, and the N-Gage's introduction. It also alleges that Nokia manipulated its reported quarterly and year-end revenues in 2003 in violation of accounting

standards, including United States Generally Accepted Accounting Principles ("GAAP").[1]

The eighty-two-page CAC relies on eleven allegedly fraudulent statements made by and/or, on behalf of, Defendants. According to Plaintiffs, all of these statements were false and misleading in violation of the securities laws. The CAC further relies on seven post-Class Period statements to establish that the earlier statements were knowingly false when made. For the sake of clarity and completeness, both sets of statements are listed here. The statements are in chronological order. In a troubling number of instances, Plaintiffs have relied on selective quotations from Defendants' statements. Portions of statements not included in the CAC, but clearly incorporated by reference in the CAC, are included here for context in italics.

## Allegedly False Statements

1. On October 16, 2003, Nokia issued a press release announcing that it had met its third quarter sales and earnings per share targets.[2] The release, attributed to Nokia's CEO Jorma Ollila, stated:

_____

[1]Somewhat after-the-fact, Plaintiffs stated in a footnote in their Response that these serious accounting allegations are only offered, at this point, to "buttress Plaintiffs' claims with respect to the lack of customer acceptance of Nokia['s] 'new' products, including the N-Gage, in 4Q03." (Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss the Consolidated Am. Compl. 4 n.1 ("Pls.' Resp."))

[2]The release contains a lengthy risk factors statement warning investors of the uncertainty of the forward-looking statements included in the release. It alerts investors that due to risk factors "actual results may differ materially from the results [Nokia] currently expect." (Decl. of Kenneth M. Kramer in Support of Defs.' Mot. to Dismiss the Consolidated Am. Compl. Ex. O 15 ("Defs.' Ex.")) These factors include: (1) "demand for Nokia's products and solutions," (2) "market acceptance of new products," (3) "the intensity of competition" and "changes in the competitive landscape," (4) "the impact of changes in technology," (5) "pricing pressures," (6) Nokia's ability to "maintain[] efficient manufacturing and logistics as well as high product quality," (7) "the success of [Nokia's] product development," and (8) "inventory management risks resulting from shifts in market demand." (Defs.' Ex. O 15) The warning also incorporated the risk factors listed in Nokia's Form 20-F for the 2002 fiscal year (_see infra_ n.4). (Defs.' Ex. O 15)

Following an announced commitment two years ago to strengthen our position in the global CDMA handset market, I am very happy to say that we have now doubled our share to the mid-teens from the same quarter last year. We expect to see continued momentum in CDMA going into the fourth quarter as we increase shipments to China, India and all major US CDMA operators.

Recent months have marked our entry into a number of new and exciting areas of mobility. We have introduced several camera phones, begun shipments of games devices and announced half a dozen phones for new growth markets.

The Nokia N-Gage has just gone on sale at 30,000 stores around the world to a very positive initial consumer response. Many outlets sold out of the device during the first day of release. Following on from this, we are seeing strong order intake from distributors and retailers. . . .

(Am. Compl. ¶ 86; Defs.' Ex. O)

2. On October 16, 2003, Ollila and Ulla James,[3] hosted Nokia's "Third Quarter 2003 Earnings Conference Call" with market analysts.[4]

---

[3]The CAC mistakenly states that this conference call was hosted by Olli-Pekka Kallasvuo rather than Ulla James. Defendants' Exhibit N, a transcript of the conference call, identifies Ulla James and Jorma Ollila as the Nokia participants on the call. Nowhere is Olli-Pekka Kallasvuo listed as a Nokia participant in that conference call.

[4]The Conference Call was preceded by a message from Ulla James, Nokia's Vice President of Investor Relations. James warned that the call's forward-looking statements "involve risks and uncertainties" that could cause Nokia's results to differ from its projected results. (Defs.' Ex. N) She went on to note that factors that could cause such differences could be found in Nokia's 2002 Form 20-F and also in a press release issued by the company earlier that day.

Nokia's 2002 Form 20-F contained a seven-page detailed "Risk Factors" section outlining which factors Nokia thought could cause its results to differ from its projections. The factors include: (1) "the markets for [Nokia's] products and solutions are characterized by rapidly changing and increasingly complex technologies. . . . In order to be competitive, Nokia Mobile Phones must continuously maintain and develop a wide portfolio of mobile phones that covers all major consumer segments and technology standards . . . . There is a risk that we will not be

a) Ollila stated on this conference call that:

> Of the various technologies, GSM, CDMA, and PDC, grew basically in line with overall year-on-year market growth, while PDMA volumes continued to decline.
>
> Nokia's market positions strengthened in the Americas across all the technologies. We have achieved major market share gains in Latin America where our market share currently exceeds the global 39% level. In the U.S.A. we're the clear market leader and we are well positioned to make further gains during the holiday season.
>
> The strong momentum in CDMA continued with our CDMA market share doubling from a year ago to the mid-teens. Going into the fourth quarter, we see an opportunity for a major increase in our CDMA volumes in India, China and the U.S.
>
> We have now achieved the number one position in the Chinese GSM market. Our distribution strategy [is] bearing fruit and Nokia brand is stronger than ever supported by competitive product offering from low end to localized feature-rich devices like the pin based Nokia 6108.
>
> . . . .
>
> *Outlook for the fourth quarter indicates a further acceleration of the market to year-on-year growth in the mid-teens culminating in full year 2003 volume of 460 million units.* I expect Nokia volume growth in the fourth quarter to exceed the overall market growth.

---

successful in maintaining and developing this wide portfolio, or that the technologies and related products and solutions on which we focus may not be brought to market by us . . . as quickly as anticipated, may not achieve as broad a customer acceptance among operators or end-users as we expect . . . ."; (2) "competitors may deliver new products and solutions earlier, or provide more attractively priced, enhanced or better quality products and solutions, than we do."; and (3) Nokia's quarterly net sales "can be affected by the global growth rate in mobile phone unit sales, which depends in part on regional economic factors . . ., competitive pressures, seasonality, the timing and success of our new product introductions and shipments . . . ." (Defs.' Ex. D 11-18) Nokia included similar cautionary language at its January 22, 2004 and April 6, 2004 conference calls, and in the written agenda for the November 2003 Capital Markets Day presentation. (Defs.' Exs. C, I, M) (corresponding to statements 5, 12, 3)

Our offering is being strengthened by the ramp up of several significant new products, such as the Nokia N-Gage, the new imaging phones, Nokia 6600, Nokia 3660, the GSM [inaudible] CDMA-based Nokia 7600, and the highly competitive entry level phone, the Nokia 3200 series.

I'm looking forward to a quarter that is expected to bring Nokia new volume and market share records.

(Am. Compl. ¶ 89; Defs.' Ex. N)

b) In the question and answer portion of the conference call, analyst Mike Walkley asked, "[m]aybe we can talk just a little more about [] CDMA. It appears you're doing a great job in gaining share in CDMA. I was just curious maybe the profitability for CDMA since a lot of your phones are maybe on the lower end and how that maybe impacts your overall mix on the ASP front." (Defs.' Ex. N) In response, Ollila said:

Yeah, I think the – if we look at the CDMA market, we really are pleased with the very steady progress that we have made in CDMA in the last three quarters. So, it's really a consistent good progress having some of these key operators, Sprint and Verizon in the U.S., Unicom in China, as well as Reliance in India as our customers, all of them in volume, you know, shipping in volume as we speak. So, we really are very pleased with how that has worked out.

The business model, the dynamics as it is in CDMA has a slightly lower EPS as an average, has a slightly lower margin. But it is a good business. We are getting a good, healthy margin, and we just love to get that business and really make progress in that segment.

(Am. Compl. ¶ 90; Defs.' Ex. N)

c) A Bear Stearns analyst asked, "in terms of in major opportunities you can have sort of gaining market shares in CDMA, and you're off to a good start. . . . But this is still very much on the low end or mid-low end where you're attacking. What about, really, though, the opportunity could be for you to grow low market share in the mid to the high end? But in North America and

Asia especially in CDMA, we're seeing a lot of demand for the clamshell phones. What's your thinking? What's your strategy?" (Defs.' Ex. N) Ollila responded:

> Okay. I think the – first of all, we want to be present in all the key segments of the CDMA market. And we have introduced our first CDMA camera phone, or imaging product, as we would say. And that phone will be shipping initially Latin America in Q4 and is a good indication of how we will be moving. Then if we look at the form factors, we will be moving to a broader set of form factors, also with CDMA, including clamshells *with time. So, you will see all of that.*
>
> . . . .
>
> And if we look at the broader set of products and opportunities in CDMA, we are working with a number of multimedia segment products which will hit the market in 2004 and 2005. So, the product road map is a very exciting one *and it has all the same elements with time that our GSM wideband CDMA portfolio does have.*

> (Am. Compl. ¶ 91; Defs.' Ex. N)

d) A Sanford Bernstein analyst asked about the delivery of camera phones scheduled for the fourth quarter of 2003, whether there were any delivery delays, and whether these phones would be in stores in time for the 2003 Christmas selling season. He also requested a projection "as to what percentage of [Nokia's] phones you believe in the fourth quarter might have a camera included?" (Defs.' Ex. N) Ollila answered:

> *. . . all of the phones you mentioned are shipping in the fourth quarter. So, we do not have delays. We really are working well and both our operational as well as the component are in good shape. So we will ship those all well in [the] fourth quarter. . . .*
>
> So, if you look at the high end, you know, what's the proportion of that out of the total? The share of color in terms of value now accounts for about 50% of the total. And that we expect to grow significantly in the fourth quarter. And if you look at the value of

the camera phones, we expect that to be in the range of 20% of the total in the fourth quarter.

We are well on our way to that as we speak. So, we feel good about that. And that just shows that it's changed towards the higher end offerings is happening. *Obviously, simultaneously you have in terms. So, volume simultaneously a very strong show from the emerging countries. But that – we'll have to that business, as well.*

(Am. Compl. ¶ 91; Defs.' Ex. N)

e) Analyst Tim Long asked about Nokia's growth in the Chinese and Indian markets and the ASP developments in those markets. Ollila responded:

I think if you're looking at two markets like China and India, you know, these are two markets where it is even more pronounced than in some others that taking an average of ASP of any other factor, you know, really distorts the picture because you have a very strong high end segment, but most of it obviously, is low and middle, entry level and middle range phones. So, you really have to look at how the segments are performing.

And we're getting a healthy margin. That's our main driver, a healthy margin from both of those markets. And that's coming from both the high end and middle range as well as entry.

(Am. Compl. ¶ 92; Defs.' Ex. N)

3. On November 24-25, 2003, Nokia hosted a "Capital Markets" conference in Dallas, Texas for market analysts covering Nokia. Various Nokia executives made presentations at the conference.

a) Ollila gave an introductory speech at the conference updating Nokia's fourth quarter outlook for 2003 and outlined the various Nokia segment presentations to follow:

*Nokia's own mobile phone volumes have progressed really well in line with our plan and we have had a really encouraging stability in our ASP's during the quarter, sequentially, and I think that really speaks well for what is happening in the marketplace and*

how our strategy is working. *When we look at the view for infrastructure market, it has evolved as indicated earlier, and Nokia networks's performance well in line with the plans that we have outlined, so the stabilization in the markets, our* restructuring has really paid off *and we can go ahead with, with a very encouraging morale atmosphere in our organization and the way that is paving the future with our customer base. So based on how the quarter has evolved so far, we believe that we'll be able to achieve the Q4 guidance both in terms of the sales as well as EPS as indicated to you.*

. . . .

*First of the business groups is the mobile phones. It* will continue to offer a unique global range of highly competitive mobile phone products for large consumer segments. . . . *The economies of scale obviously to be exploited to make sure* that we get the lowest cost structure and that we get the fast product renewal to ensure product competitiveness which has been our strength in the past.

. . . .

*We expect multimedia business group to reach, break even by the end of next year, 2004. This is an area where we know we can really make it big, where there are tremendous growth opportunities,* we have know-how, where we can bring mobility to many of these areas, particularly the games imaging, media products, and we have the concepts to make it happen. *We also have the partnership network so this is an area where we feel that you will see the new Nokia happen in the next three to five years.*

. . . .

*But finally, my final comment will be around the key things that I feel will maintain the competitiveness, will make the competitiveness of Nokia in the future. Things that will make Nokia to achieve the great results we have in mind, which I'm sure you will expect us to have in the years to go.* First of all, it's all about products. We are a product company. It's all about product range, the segmentation. The product cycles are being accelerated. That's the push for the market, how we can respond to that, and the fact that industry is becoming highly competitive. We feel this area is number one among the factors for us.

(Am. Compl. ¶¶ 96-98; Defs.' Ex. M)

b) Olli-Pekka Kallasvuo gave a presentation at the conference about Nokia's mobile

phone unit:

> Cost leadership will continue to be of extreme importance and I
> think we really need to continue to be cost leaders in all categories.
> So the thinking, okay let's leave the low-end if you will aside, and
> concentrate on mid-end, if there is a concept like mid-end, and the
> high-end and really kind of escape to that direction, I don't think it
> is a winning strategy.  *Cost leadership in all segments of the*
> *market will continue to be our strategy, and obviously the fact that*
> *one can get the volumes there by being present in all segments, it's*
> *extremely important when it comes to your volume benefit and also*
> *in the so-called low end you can exploit modularity in a mature*
> *way.  Well Pertti was mentioning about art and science.  I think*
> *here we've got an example.  This is both art and science, when it*
> *comes to segmentation.  Unfortunately my time will not allow [me]*
> *to talk about this more, but I think there's a lot of benefit we can*
> *bring to the table by continuing to segment the market in a way*
> *that makes sense from the sales and branding point of view,* and
> this low end mid range high end thinking continues to be overly
> simplistic.
>
> . . . .
>
> Now, before moving to the cost leadership I want to tackle CDMA
> briefly.  Not other segments of this business I will simply make
> some comments on the CDMA, there being many questions here.
> I'm sure there will be more during the course of today and
> obviously especially in when you are in the U.S. CDMA attracts a
> lot of attention.  So obviously we've got, we've made some very
> good progress in CDMA this year and we are making that progress
> right now as we speak.  We have doubled our market share and we
> really can in a very realistic way target even higher market share
> here.  So why is this happening now?  I think it's very simple.  For
> a long time I think we were under-investing in CDMA when it
> comes to R&D.  We basically did not necessarily completely
> understand the complexity there is in the CDMA market, and really
> didn't seem to get there [no matter] how hard we always tried.  In
> the summer of 2000 we made important decisions to increase our

investments in CDMA, really made a commitment saying that now we simply need to pay more [attention] by investing more to get the sustainable position and then really catch the other players in the industry. And I think this what we are seeing now is simply a consequence of that decision. Money being spent, invested, of course there again that's expense while doing so, and we are seeing the results. I think we are now in a situation where we really are competitive when it comes to CDMA engine. And the engine really is well performing. And now really it's time for us to make the expansion based on that engine to other, to more categories of the market, cover more segments, more high-end if you will. The possibility to that is right there, and we are doing right now. And then of course also drive CDMA to convergence and push, for instance, Symbian to CDMA. And the beauty here is that when doing so, the commonality between different standards, between CDMA markets and GSM markets will increase. When you move to the higher layers of software and application platforms, you really can benefit more from the commonality there between CDMA and GSM, and I think that will increase our competitive position here.

(Am. Compl. ¶¶ 100-02; Defs.' Ex. M)

c) An analyst posed a series of questions concerning CDMA strategy at the conference. The questioner said that "in terms of CDMA strategic directions, if I look you guys [ha]ve done a really good job in gaining and you have a really good momentum now in CDMA but at the same time we're seeing [others roll out competition] . . . if you look at longer term, you have a good position . . . do you feel like you need to also control the network side of the business. . . . The second question . . . Olli-Pekka Kallasvuo related somewhat to CDMA but also the clamshells, clamshells tend to have a little bit more moving parts, higher warranty repairs, little higher assembly costs, and especially same thing applies to CDMA which tends to have a little much more customization for individual carriers. As you start building expanding in those two subsegments do you expect that, is that going to have some negative impact on your operating

13

margins in the core handsets or do you think . . . [that it] shouldn't have much of an impact at all?" (Defs.' Ex. M)  Ollila responded:[5]

> So but to be quite honest you know, this time we are getting closer because this we have, we have really worked on and thought about and you know, now we are getting into a situation that there probably would be benefit because we are getting into new areas. There are different complexities, there are the service platforms, etcetera, etcetera.  And you know, not to go anything deeper to it but this is something that we have worked on, lets leave it at that.

> (Am. Compl. ¶ 103; Defs.' Ex. M)

Kallasvuo supplemented Ollila's response (in a portion not contained in the CAC):

> *About the design and the clamshell question you know, I've said many times before in situations like this and elsewhere that Nokia's brand value is such that we are not designing me too products and we took some time to look at you know, how we are going to approach this clamshell thing.  We have now introduced the first product and I am absolutely convinced that this is going to be one of the highest margin products in this industry once we get it out in volume in January, and it will not sell because it's a clamshell, it will sell because it's beautifully styled.*

> (Defs.' Ex. M)

    d) Anssi Vanjoki also made a presentation at the conference about multimedia, including camera phones and gaming devices:

> If we look at the current camera industry which equals about [a] hundred million devices, why should we not count this industry to be the addressable market for Nokia as well?  I have at least started to count it as my market.  What's special in making a camera? After all in two years we became [the] world's largest manufacturer of cameras. . . . Right now we see our cameras are

---

[5]The CAC mistakenly attributes this answer to Kallasvuo.  Defendants' transcript of the event has Ollila giving the answer quoted in the CAC.  Kallasvuo follows Ollila's answer with an answer of his own not contained in the CAC, but supplied here for completeness.

exactly what's there. There are a number of megapixels and multiple megapixel cameras available in the market but first of all are they affordable to the consumer? The answer is no. Secondly, is the whole imaging chain to take use of these cameras existing and in balance? The answer is again no. But next year this is not going to be so anymore. The whole imaging chain is able to support this kind of camera, and Nokia's early selection of technology to go with Fima sensors in the cameras is really starting to pay off for us in a big manner. And in this way we can make the right cost, right cost balance for sophisticated imaging devices. *At the same time we need to involve all those [other] market makers into this.*

. . . .

Games are hot. Christmas is coming. And this year we participate in that market in a grand scale. We have brought the first N-Gage unit to the market and we have started the games business also in the publishing side. If there are hot areas in games it's online and it's mobile. What N-Gage does, it puts these two hot areas together and makes it truly hot. It's not going to be one Christmas phenomenon and we are not expecting that the first Christmas is going to make it for us, but when we have gone through three cycles, i.e. three Christmases, because game industry peaks to the tune of Christmas, then we can say whether we have this market in the pocket or not. The starting's very good. We are tracking this business, we are seeing repeat orders come in and in certain markets which are more prone for this we see the whole thing starting to work just as we have planned.

. . . .

*Currently the games offering is not very wide but it is growing rapidly and by the end of 2004 we will have more than 100 games supported and next summer will be very important because then the first games that have been from the first row of code [have] been developed for online mobile multiplayer games will hit the market.*
(Am. Compl. ¶¶ 105, 107; Defs.' Ex. M)

e) Later in the presentation, someone inquired: "on N-Gage when can we expect an

update to the first generation hardware platform that would deal with some of the limitations of

the first product, and second I know you don't want to get into a month by month sales figure for

N-Gage but with the initial ramp would it be a help if you give us some sort of update on the

400,000 units shipment for N-Gage that you gave earlier in the quarter[?]"  (Defs.' Ex. M)

Vanjoki responded:

> Those few hundred thousand people who up to now have bought
> the unit are really critical for us because they are the first true
> customers who have paid their own money for the devices.  And
> they want to give us feedback.  They are giving us feedback and
> the great thing in comparison to many other devices that been
> brought to the games market is that we have the N-Gage arena.
> We have an online connection with these people and we are getting
> a lot of feedback.  This feedback is converted already today into
> activity into our R&D and I expect that when the next cycle, i.e.
> Christmas 2004 comes, we have fixed any of those things that the
> consumers today are not liking in this product, so definitely we are
> taking action in this area and like I said you know, we are here for
> the long haul with the games industry.  The starting is really very
> good and the endorsement of the key players in this business gives
> us good feeling that the long haul will actually pay off.

> (Am. Compl. ¶ 108; Defs.' Ex. M)

f) Another analyst asked about the general sentiment that operators do not want to see

Nokia gain in market share.  He asked Vanjoki to "comment on what you think the marketshare

development will be and how your relationship with operators might need to change such that

your brand does not, since it's ahead of them in their brand rankings, become a threat to their

plans to offer their own brand services[?]"  (Defs.' Ex. M)  Vanjoki responded:

> Yeah.  I think that it is the same for anybody in any business that if
> you have a strong partnership with somebody and that represents a
> majority in your business dealing with the partner you start to sort
> of suspect that you know, is this right?  And then it is very much a
> behavioral question.  If the other party behaves in a way that is
> encouraging the cooperation rather than in a way that is all the time
> setting it in question then I think the true partnership can be found.

This is what we have found with the big operator groups around the world where the main driver in fact is the trustworthiness of the partnership and the behavior that you show. If we would behave in a way that would give a reason for operators to shoot for something else, then I'm sure that you know, they would use their power much stronger than what it is today. I think it is only natural for any operator or any other business where you are part of the chain that you want to sort of hedge your bets and you want to enable other people as well to play in the equation and as such we have nothing against this as long as we always have the same chance, and so far I can only report that we've had the same chances as the newcomers.

(Am. Compl. ¶ 110; Defs.' Ex. M)

g) Ollila closed the Capital Market presentation with some comments:

At the same time we are seeing a replacement market which is at the level today than what we thought it would be a few years back or a little higher. Share of the total industry we estimate to be total industry volume shift we expect to be well over 60 percent this year and somewhat bigger in 2004. So when we look at the percentage of phones replaced from the subscriber base we can see that this renewal rate has, is changing. It's not a curve which goes down. It's actually recovering and the renewal rate has experienced a turning point, seems to be stabilizing at 25 percent, and really does represent a significant and interesting and sort of annuity for a company like ourselves with the kind of customer loyalty, brand recognition that we have. So growing customer base, growing base of subscribers providing through the renewal rate, an interesting opportunity for a company like ourselves. When we look at the market we are back on the growth path after a disappointment in 2001 and not much of a recovery to write home about in 2002. But this year growth of more than 10 percent, 460 million units, perhaps a bit stronger you might say. Yes, perhaps a bit stronger. In 2004 growth of more than 10 percent allowing an interesting opportunity that is given a little bit of a hint also from the stabilization of the ASP's in the fourth quarter, as I noted first thing at noon when we kicked off.

. . . .

This 40 percent target was very well set I feel because it was not an

easy one, but at the same time attainable, and we are getting very, very close in the fourth quarter, so let's revisit that topic in January, February, when we're, when we'll be able to communicate to you more.

. . . .

So we look at gaining share, continuing to do that, also in 2004. That's the way we set our business goals. Then if we look at our strategic areas this year. Early this year in January and February we were quite explicit that there are three areas where we want to set our sights and make sure that we will do better towards the year end. First of all the, it was the issue of the U.S. We did not have much fun in terms of our market position evolution in the U.S. But now with the vastly improved product portfolio, greatly improved share in CDMA, and first time ever in all the major U.S. carrier quarter four campaigns, us being included, it means that we are now in a very strong position in the U.S. In China our marketshare has improved during the last four or five months with our China-specific products and distribution, and we have gained our number one position back in GSM and we have entered the CDMA market, so our position in China is well stabilized and Colin Giles who has done a great job in a very challenging marketplace will be available to you tomorrow and he has some pretty good stories to tell. And then finally in CDMA, I think Olli-Pekka already told about that. We have doubled our share. We, you know, when we set our sights on something we get results. And I think that our CDMA effort is a good testament for that. And you'll hear more about all these three things tomorrow.

(Am. Compl. ¶¶ 112-113; Defs.' Ex. M)

4. In a press release dated January 8, 2004,[6] Nokia stated:

Nokia Mobile Phones sales in the fourth quarter of 2003 increased to approximately EUR 7 billion, up 4% year on year (versus the previous guidance of flat to slightly up) due to better than expected market development leading to strong Nokia unit volumes. Due to this and a favorable product mix, Nokia Mobile Phones' pro forma

---

[6]The release is titled "Nokia fourth quarter 2003 sales and profitability to exceed its guidance: Stronger than expected Q4 will result in pro forma EPS (diluted) of EUR 0.28 - 0.29"

operating margin continued at the excellent level of between 24% and 25% for the quarter. *At the moment, Nokia is not in a position to comment on overall mobile industry volume growth for the fourth quarter 2003. However, Nokia Mobile Phones' fourth quarter unit volumes were 55.3 million.*

(Am. Compl. ¶ 116; Defs.' Ex. B)

Ollila is quoted in the release saying:

The strong seasonal development in both Nokia Mobile Phones and Nokia Networks exceeded even our own expectations. High volumes and an excellent mix in Nokia Mobile Phones delivered healthy sales and an average selling price that was up sequentially. Nokia Networks results were impacted by stronger than expected year-end operator investments and product mix which resulted in much stronger than expected sales and stronger than expected operating profits.

(Am. Compl. ¶ 117; Defs.' Ex. B)

5. On January 22, 2004, Nokia hosted an earnings call in conjunction with the release of its fourth-quarter and year-end results for 2003.

a) In this call, Ollila discussed 2003 and projected for the first quarter of 2004:

For Nokia Mobile Phones 2003 was a great year. Nokia Mobile Phones was able to deliver record volume and record sales and profit. . . . At constant currency, sales growth was an impressive 12%.

. . . .

For the first quarter, we currently do expect first of all that Nokia net sales will grow between 3 to 7%. Secondly, that the diluted reported EPS will range between 17 and 19 euro cents.

. . . .

The good momentum of the handset industry is expected to continue also in the first quarter. We project the market volumes

to grow somewhat over 20% year-on-year versus 11% market growth a year ago in the first quarter. With our current product lineup gaining momentum we expect to grow volumes faster than the market.

I also feel encouraged by our product pipeline for the rest of the year. *These new products and product concepts will enable us to further strengthen our overall competitiveness.*

(Am. Compl. ¶¶ 119-20; Defs.' Ex. C)

b) Ollila also discussed Nokia's ability to forecast demand:

*The higher than expected robust industry demand during the fourth quarter [2003] resulted in a very healthy level of channel inventories at year-end.*

*In spite of some tightness of supply in the market, we were able to deliver according to our plan but our ability to capitalize on the upside during the biggest sequential volume ramp-up in the history of mobile phone industry was limited. Vendors with previously high channel inventories were able to benefit from the unexpected demand while the ones with lean channel inventories experienced occasional stock-outs.*

*I would now like to comment briefly on the importance and some of the issues relating to the mobile phone industry volume estimate and the relevance of that to us.*

Nokia deploys internal bottom-up process in the market forecasting. Our aim is to have a fact-based market understanding both globally and on [a] country level in order to support our internal planning.

I believe our market estimates historically have been pretty accurate for several reasons. We have exceptionally good visibility throughout the channel as we are present in most of the country markets. Distribution channels as well as in most of the technologies, and in most of them we are also the market leader.

With our performance, we have demonstrated that we have been able to forecast demand with a high degree of accuracy and our

view of the market side is also shared by the other leading mobile phone manufacturers.  I also believe that any attempt to measure a truly global market of several hundreds of millions is always an estimate, even at best.

(Am. Compl. ¶¶ 121,125; Defs.' Ex. C)

c) In response to a question from analyst Paul Sagawa regarding future projected ASPs, Ollila explained:

> *I think there are good chances for us to get better there, but I would like to hasten to add that as I've said in my previous comments, you know, we don't run the business based on ASP[]s, and I really want to underline that Paul.  We manage this based on revenue, market share to drive profits.  So this is how we want to optimize it, and when we look at how the earnings, the margin level and the overall earnings developed, it was just tremendous in the fourth quarter.*
>
> *So ASP was not something that we would follow or that I would get reports weekly or something, but I do get* reports weekly on revenue and on how we feel we are doing against our competition and how our share is evolving.  *So those are the parameters which then drive the profits which we have in mind.*
>
> *So the ASP is something which is a little bit of an end product of all that, and all I can say is that, yes, there's a good chance of doing better than the constant currency 5%, but I don't have a figure that I would be working against, because it's not a parameter in my model which I have in my head and in front of me.*

(Am. Compl. ¶ 122; Defs.' Ex. C)

d) During the call, Ollila also discussed the positive fourth quarter of 2003:

> *In the fourth quarter Nokia delivered a record volume of 55.3*

> *million phones representing a sequential volume increase of 10*
> *million units, and a sequential growth of 22%.*  A shift to color and
> to more feature-rich devices together with an increase in the
> newness of our product portfolio were the drivers for the positive
> 2% sequential ASP development in the fourth quarter.

> (Am. Compl. ¶ 123; Defs.' Ex. C)

e) During the call, Ollila also discussed Nokia Mobile Phones' strong year in 2003:

> *For the first time in Nokia Mobile Phones history*, annual gross
> margins exceeded 40% driven by newness of the portfolio,
> improving quality, and continuing efficiency gains.
>
> _____
>
> (Am. Compl. ¶ 124; Defs.' Ex. C)

f) In the question and answer portion of the call, an analyst asked, "[o]n your [market] share it doesn't seem to have risen last year significantly on the last six months although you reach your strategic objectives in China and CDMA, in America you're reaching them.  Do you feel there's a chance you're perhaps hitting a ceiling on your market share now that, or what really has to happen for that share to hit 40% in 2004, do you think?" (Defs.' Ex. C)  Ollila responded:

> *Well I think that we wouldn't have had any problem in getting*
> *more share had we wanted to go down in price going in the low*
> *end.  So that's the general statement.  And then, obviously*, we
> have a situation where we, as I noted I my opening comments, we,
> in the fourth quarter, we were constrained in shipping more than
> what we actually did, *so I don't think, so* we are very relaxed about
> the 40% and the target, *and the 38% that we achieved, because we*
> *know that we are in that ballpark, can be reached.  It's not, it*
> *would not have been beyond our reach had we planned a little bit*
> *better the volumes in the low end, so we certainly have not reached*

*the ceiling.  That's really the conclusion from that.*

(Am. Compl. ¶ 126; Defs.' Ex. C)

g) Another analyst asked about Nokia's projected market share for Europe in the first quarter of 2004.  Ollila responded:

On Europe, we expect to gain share in Q[1] in Europe.  It's a major market for us.  Our product positioning worked really well in the fourth quarter, particularly in the high end, and our, some limited availability in the low end and also unwillingness then to move price meant that share was not what we had in mind in the fourth quarter, but we did very well there.

Now there is scope to do a bit better and when I commenced earlier on the momentum of the final quarter of last year continuing to the first quarter, I think that's really Europe, which one can refer to more than to any other region.

(Am. Compl. ¶ 127; Defs.' Ex. C)

6.  On February 6, 2004, Nokia filed with the SEC its Form 20-F for the fiscal year of 2003.  The 20-F included sections on "Risk Factors," "Core Business Strengths," and "Operating and Financial Review and Prospects."[7]  The 20-F also contained certification statements from various Nokia executives.

a) "Risk Factors" - Plaintiffs allege the following factors from that nine-page section are misrepresentations:

Changes in the mobile communications industry require us to develop complex, evolving technologies to use in our various

---

[7]Plaintiff mistakenly identifies this section as "Management Discussion & Analysis."

businesses, some of which are new to us.  If we fail to develop these technologies or successfully commercialize them as new advanced products and solutions that meet the demands of the market, or fail to do so on a timely basis, or if the evolution of our operating environment is slower than anticipated leading to delays in the deployment and acceptance of new services, it may have a material adverse impact on our business, our ability to meet our targets, and our results of operations.

 . . . .

Despite our recent reorganization, we may not be able to commercialize new products and services successfully or profitably, or respond fast enough to the changes in the industry.

. . . .

The technologies, functionalities and features on which we choose to focus may not achieve as broad customer acceptance as we expect.  This may result from numerous factors including the availability of more attractive alternatives or a lack of sufficient compatibility with other existing technologies, products and solutions.

. . . .

In our mobile device businesses, we seek to maintain healthy levels of sales and profitability through offering a competitive portfolio of mobile devices, growing faster than the market, working to improve our operational efficiency, controlling our costs, and targeting timely and successful product introductions and shipments.  For us a competitive portfolio means a wide and balanced mix of commercially appealing mobile devices with attractive features, functionality and design, covering all major user segments and price points.

. . . .

We may experience difficulties in adapting our supply to the demand for our products, ramping up or down production at our facilities, adopting new manufacturing processes, find the most timely way to develop the best technical solutions for new

products, or achieving manufacturing efficiency and flexibility,
whether we manufacture our products and solutions ourselves or
outsource to third parties. Such difficulties may have a material
adverse effect on our sales . . . .

. . . .
_____

[A] failure could occur at any stage of our product creation,
manufacturing and delivery processes, resulting in our products
and solutions not meeting our and our customers' quality, safety
and other corresponding requirements, or being delivered late,
which could have a material adverse effect on our sales, our results
of operations and reputation and the value of the Nokia brand.

. . . .

Should we fail to implement the new organizational structure
effectively and smoothly, the efficiency of our operations and
performance may be affected, which may have a material adverse
impact on our sales and results of operation during 2004, and
possibly also thereafter.
_____

(Am. Compl. ¶ 130; Defs.' Ex. Q)

b) "Core Business Strengths" - Plaintiffs selected one of the five listed core business

strengths as a misrepresentation:

Strong Product Offering: Our strong product offering goes beyond
voice-centric mobile phones to include entirely new functional
categories of mobile devices, such as enhanced communicators,
entertainment and gaming devices and media and imaging phones.

(Am. Compl. ¶ 132; Defs.' Ex. Q)

c) "Operating and Financial Review and Prospects" - Plaintiff selectively quotes from this

twenty-one-page section, from a subsection entitled "2003 compared to 2002":

Our gross margin in 2003 improved to 41.5% compared to 39.1%
in 2002, with the improvement coming primarily from Nokia
Mobile Phones *and to a lesser extent from Nokia Networks*. In

2003, the clear improvement in the quality of our mobile phones resulted in a lower quality cost per phone than in 2002. *Also the product mix consisted of slightly more lower-end phones with lower product costs, and contributed to a lower average cost per phone. Depreciation of the US dollar and also the Japanese yen also contributed to a lower average cost per phone because more than 50% of our mobile phone components are sourced in US dollars and approximately 25% in Japanese yen. All these factors together decreased cost of sales in Nokia Mobile Phones.*

. . . .

Net sales of Nokia Mobile Phones reached their highest level ever at EUR 23,618 million in 2003, representing an increase of 2%, compared to EUR 23,211 million in 2002, driven by the consumer uptake of color-screen and camera phones, Nokia's growing presence in growth markets, and Nokia's increased share of the US, China and CDMA markets. *While Nokia Mobile Phones volumes grew by 18%, net sales were adversely affected by the weak US dollar. At constant currency, Nokia Mobile Phones net sales would have grown by 12% year on year.* Sales growth in Europe, Middle-East & Africa was to a large extent offset by lower sales in the Americas and Asia-Pacific.

. . . .

Nokia Mobile Phones launched 40 new products during 2003 with an emphasis on more advanced devices, CDMA technology, entry-level phones and market localization. Of the new products launched, 31 models had color screens, 14 models had cameras and 24 models were MMS-enabled. *There were 12 Nokia camera phone models on the market by year-end.*

We strengthened our position in three strategic areas by attaining the number one market position in the United States and the number one position in GSM in China, as well as significantly increasing global CDMA market share.

(Am. Compl. ¶ 135; Defs.' Ex. Q)

d) The CAC also includes statements regarding the Symbian Operating System, in which

Nokia "would soon seek to acquire a controlling share," noting that the operating system:

> has wide support from the mobile industry as well as a very active and large group of applications developers and operators. . . . *At the moment, revenue from our software licensing activities is immaterial.*

> (Am. Compl. ¶ 136; Defs.' Ex. Q)

e) The CAC also quotes the Form 20-F certification statements of Jorma Ollila and Richard A. Simonson. (Am. Compl. ¶¶ 138-39; Defs.' Ex. Q)

7. On February 6, 2004, Nokia also issued its 2003 Annual Report to Shareholders. The Report included a section titled "Review by the Board of Directors" and "Risk Factors."

a) The CAC quotes from the Review by the Board of Directors from a subsection titled "Nokia Mobile Phones in 2003":

> For the full year 2003, Nokia volumes reached a record 179 million units, leading to an estimated market share slightly above 38%.

> Nokia Mobile Phones broadened and revitalized its product portfolio by launching 40 new products during 2003 with an emphasis on more advanced devices, CDMA technology, entry-level phones and market localization. In addition to focusing on innovation and design in the portfolio in 2003, Nokia also made good progress in improving the quality of its processes and products, leading to concrete results.

> (Am. Compl. ¶ 141; Defs.' Ex. J)

b) Plaintiff also quotes from the Risk Factors section:

> Changes in the mobile communication industry require us to develop complex, evolving technologies to use in our various businesses, some of which are new to us. If we fail to develop these technologies or successfully commercialize them as new advanced products and solutions that meet the demands of the

27

market, or fail to do so on a timely basis, or if the evolution of our operating environment is slower than anticipated leading to delays in the deployment and acceptance of new services, it may have a material adverse impact on our business, our ability to meet our targets, and our results of operations.

. . . .

Reaching our targets depends on numerous factors, such as our ability to offer products and solutions that meet the demands of the market and to manage the prices and costs of our products and solutions, our operational efficiency, the pace of development and acceptance of new technologies, our entry into new business areas, and general economic conditions.  Depending on those factors, some of which we may influence and others of which are beyond our control, we may fail to reach our targets and we may fail to provide accurate forecasts of our sales and results of operations

Our sales and results of operations could be adversely affected if we fail to efficiently manage our manufacturing and logistics, or fail to ensure that our products and solutions meet our and our customers' quality, safety and other corresponding requirements and are delivered in time.

. . . .

‾‾‾‾
If we are unable to effectively and smoothly implement the new organizational structure effective January 1, 2004, we may experience a material adverse impact on our operations, sales, and results of operations.

‾‾‾‾
(Am. Compl. ¶ 143; Defs.' Ex. J)

8.  On February 23, 2004, Nokia hosted a press conference at the Cannes World Congress.

   a) Plaintiffs cite various statements Ollila made at the conference:

      The third area of opportunity in today's mobile industry continues to be voice, where there is, tremendous growth, as well as innovation insight.  We move into 2004 building on the base of strong development in 2003, last year.

      ‾‾‾‾

(Am. Compl. ¶ 145; Defs.' Ex. S)

> Imaging is, today, the most important application in the mobile multi-media. Camera phones became a huge success last year, with the global market volumes exceeding 70 million units. Nokia has been in the forefront in bringing high quality imaging devices to the market, and the Nokia 6600 is the greatest example, where we have combined high quality camera and advanced smart phone functionality into an easy to use package. I'm happy to share with you today that the Nokia 6600, after its introduction to the market last October, has become the world's best selling smart phone, with volumes to date exceeding two million units.

(Am. Compl. ¶ 146; Defs.' Ex. S)

b) When questioned about Nokia's relationship with Vodafone, Ollila responded:

> I'll be very brief. The – because the nature seems to talk as well. So the, I think we're very pleased with the dialogue we have had with Vodafone relating to that 2-1/2 G Vodafone Live Implementation, particularly the success of 6600, as well as the 3 or 4 other phones that are part of the Vodafone Live are good, good omen going forward, because we have some very good, very interesting, exciting discussions underway as Arun [Arun Sarin, Vodafone CEO] indicated about how we can get new products, 3G products particularly, into the market as part of the Vodafone offering and, we will work very well with a number of our other operator customers because that's the way the collaborative approach needs to work, going forward, and, and I think the Vodafone and Nokia cooperation has been really exemplary in the respect.

(Am. Compl. ¶ 148; Defs.' Ex. S)

9. On March 17, 2004, Nokia executives held a press conference at a trade show, known as CeBIT, in Hannover, Germany.

a) The executives made statements concerning the N-Gage:

> It's been five months, or actually five months and ten days, to be exact, that we introduced the N-Gage game deck to the market.

29

Our expectation at the time was that it will be hard, it will be challenging, and it will be interesting. And we certainly receive[d] what we've expected. *But also, what we've expected is consumer behavior online, and we've also received that. So from an online perspective, it's truly been also what we've expected.*

. . . .

And clearly we've broken the ice on the online area with the rich games of N-Gage. But ensuring on the mobile online story is the fact that N-Gage is also the number one device on downloadable games, as you can see of the statements of some of our stakeholders. Whether it's Java games or Symbian downloadable games, you can always say that has been a success. For us, again, that's a very assuring, because the N-Gage device is actually used for what it was intended to be used for, mobile gaming. It's the right track and we're building on it.

(Am. Compl. ¶ 150; Defs.' Ex. T)

b) The Nokia presenters were later asked why the N-Gage's selling price had so rapidly fallen since it was introduced to the market. Pasi Polonen responded:

I can answer that concerning the pri[c]e point. The first pri[c]e point was, obviously too high, so that's why it was changed.

(Am. Compl. ¶ 151; Defs.' Ex. T)

c) Another questioner noted that Nokia had stated that the 3G and Series 60 devices were selling well and inquired whether this would have any sustainable impact on Nokia's average selling price. Polonen responded:

The average selling price is, you know, for this device as being 3G or being Series 60 devices, are clearly above our normal mobile phone, so the more we sell there it has a positive impact on Nokia's average selling price, if that's what you are meaning. I'm meaning [unintelligible]. I think definitely we'll see new functionality adding also value at the terminal, so people will buy

it, new device, mobile devices with higher price in the future because they provide more.

> (Am. Compl. ¶ 153; Defs.' Ex. T)

10. On March 25, 2004, Nokia held its annual shareholders meeting in Helsinki, Finland. Ollila made a few statements at that meeting that are referenced in the CAC:

> 2003 was a record year for the mobile handset industry and for Nokia Mobile Phones. . . . Nokia Mobile Phones reached not only record profits, but also higher-than-ever sales and volumes.
>
> _____
> (Am. Compl. ¶ 155; Defs.' Ex. R)

> *There are several factors which impacted positively on our net sales – for instance,* high sales volumes of Nokia Mobile Phones and a favorable product mix. *Nokia Networks' restructuring had a positive impact on Nokia's profitability. The actions already showed results in the fourth quarter as Nokia Networks' profitability improved.*
>
> . . . .
>
> During the year [2003], Nokia was able to reach several important strategic milestones: we attained the number one market position in the United States in mobile phones and the number one position in GSM mobile phones in China. We also significantly increased our global CDMA handset market share.
>
> We reached these goals in part due to our strong product portfolio. As we have earlier stated, we launched 40 new products last year. This was a record number of mobile device launches for Nokia during one year. This year, we expect to launch a similar number of products. I strongly believe that our product portfolio continues to be very competitive.
>
> (Am. Compl. ¶ 156; Defs.' Ex. R)

> In the game industry, Nokia has a long-term strategy. We are currently developing this business area and building the N-Gage brand. After N-Gage was introduced, we have conducted several

surveys among gamers.  Based on the results, we can say that the N-Gage brand and the completely new ways of mobile gaming it offers are already well recognized.

(Am. Compl. ¶ 158; Defs.' Ex. R)

With our strategy and our new organization, we are well positioned to take advantage of the next growth phases in our industry as well as offer the benefits of mobility to consumers, businesses and the global community.

Even in a challenging environment, we have built a strong base for the next growth phase.

(Am. Compl. ¶ 159; Defs.' Ex. R)

11.  On March 25, 2004, Nokia also issued a press release in connection with the annual shareholder meeting.  The release quotes Ollila:

Nokia launched a record 40 new mobile devices last year, and we expect to launch a similar number in 2004 . . . . Our product portfolio will continue to be very competitive.

(Am. Compl. ¶ 157; Defs.' Ex. P)

**Statements that Allegedly Establish Defendants' Earlier Statements were False when Made**

12.  On April 6, 2004 Nokia conducted their First Quarter 2004 Update call.

a) Ollila stated in his opening comments:

*For the first quarter, Nokia net sales are expected to decline by 2% year on year versus a guidance of 3 to 7% growth year on year. . . .*

*Nokia market share development was positive in Latin America China and the rest of Asia remained stable.*  Due to some gaps in our product portfolio, mainly in the mid range, we were not able to maintain our market position and fully capitalize on the positive market development in Europe and the U.S.

Sales of the mobile phones business group were below expectations. Sales declined in Europe and Asia year on year. In Europe, the decline was driven by somewhat lower than expected volume and a product mix more weighted towards the low end.

In Asia, Nokia's volume development was positive. But sales were negatively impacted by the mix shift towards the low end.

. . . .

*While* our product portfolio in the first quarter was not at its strongest, *we believe that during this year with around 40 product launches we expect to see improvement in our market position in the coming quarters.*

(Am. Compl. ¶ 164; Defs.' Ex. I)

b) In the question and answer portion of the call, an analyst asked, "I was wondering, if you look at the key element, which seems to be some vulnerability in your product portfolio in, I think you specifically mentioned Europe and the U.S. I was wondering, what steps you might be looking at in order to alleviate that, and what sort of time line do you think it may take for that direction to change? Would it be something that would you begin to expect in the second quarter, or what sort of time line?" (Defs.' Ex. I) Ollila responded:

I think if we look at the particularly mid range, you know, we saw early on last year that what might be happening is that we are not fully competitive, so certainly we have started to take measures. *So if you now look at what is happening this year, we have launched seven new models and have started shipping five products that have – that were launched last year. Most of them addressing the – the areas of vulnerability, as you said.*

*They will be more phones coming to the market that will be launched in the second quarter as well as in the second half. And all of those will have a meaningful impact during 2004. With around 40 phones totally being launched, we expect that this will be a typical year in that respect.* But in the early part of the year we will not be quite as competitive in those segments that we did –

than we have been earlier and that we will feel that we will be towards the end of the year. It's particularly GSM clam shell, mid-range classic and some of the high-end must have areas.

> (Am. Compl. ¶ 165; Defs.' Ex. I)

c) Another analyst asked, "[i]s it just a problem with the midend, or have you been losing share, do you think, or have you been seen more share pressure in other regions outside of Europe or is it just in the midend?" (Defs.' Ex. I) Ollila responded:

> Our strength in Asia, including China, as well as Latin America, has compensated somewhat, but the way in which we have not been able to grow with the market in Europe and the U.S. where our share has been very, very strong, incidentally, U.S. has been impacted by the shift from TDMA to GSM, and Europe we have a very high share in many of the countries. And the gap really comes from the mid-range. That's where it is coming from. And I – I think I would hold on to that when we have analyzed what's happening in the market.

> (Am. Compl. ¶ 166; Defs.' Ex. I)

d) Another analyst asked how Nokia planned to regain its share in the "midend of the market," and what potential cost implications this would have. (Defs.' Ex. I) Ollila responded:

> I don't think there's anything specific there. It's really that the product portfolio which is in the product road map which will make a difference. There's no trick. We have certainly had a quiet spell in our product road maps. We will improve, and there will be – there will be a better coverage of the key segments in that mid-range. *And generally speaking, our competitiveness obviously we'll continue to improve through a better cost – it's not simply unattractiveness of design but always question of having a flow of products which are – which are cost efficient, vis-a-vis the niche of the market, so you can maintain a healthy profitability, which is obviously our goal.*

> *So, yes, design does play a role, and the different form factors which we will cover better to when we move towards the second half of this year.* And some of the issues which we have []

> addressed in the road maps which are in place. So it's not that we
> start tomorrow and then get something out in 12 to 18 months. It's
> something which – things being in the road map already and we
> feel we will be covering the ground a lot better.

> (Am. Compl. ¶ 167; Defs.' Ex. I)

13. On April 16, 2004, Nokia issued a press release noting net sales decline of two percent in the

first quarter of 2004.

> a) The release explained:

> > Net sales in all sales areas, except for North America, were
> > impacted by a product mix more weighted towards the low end. In
> > addition, net sales in Europe and the United States were impacted
> > by gaps in the mid-range of the portfolio.

> > (Am. Compl. ¶ 170; Defs.' Ex. K)

14. On April 16, 2004, Nokia hosted its First Quarter 2004 Earnings Conference call.

> a) On the call, Ollila reviewed the first quarter of 2004:

> > Sales in Asia, including China, declined due to *U.S. depreciation
> > and* product mix weighted more towards the low end. Sales
> > development was weakest in Europe and associated with certain
> > weakness in the current mid-range product offering.

> > (Am. Compl. ¶ 172; Defs.' Ex. U)

> > I would now like to end by making a few comments regarding our
> > handset portfolio. As mentioned, we have made many changes
> > over the last year to improve our product portfolio. Over the
> > coming months you will see the results of this work in a number of
> > new products, but more importantly, in the variety of features and
> > phone factors. We are not satisfied where we are today, but we are
> > seeing steady improvement in our product road map and expect to
> > again have the leading portfolio in the months ahead. *In very
> > broad terms, out of our current portfolio of close to 100
> > product[s], 40% can be allocated to entry-level, and the rest is
> > split evenly between mid-tier and high-end.*

*We have already started to ship six new products this year, and we have also announced another nine products, with shipments estimated to commence mostly during the second and third quarter. We intend to launch a total of approximately 40 products this year. Nine products have already been launched and the coming launches will be more or less evenly spread in the coming quarters with shipments weighted towards the second half of the year.*

*We expect half of the new products to be in the high price point higher functionality categories, while the balance will be evenly split between mid-tier and entry level.* By the end of the year we expect to have around half a dozen clamshell handsets together with other phone factors shipping, and, of course, the vast majority of these will have color screens and cameras

With the enhanced product portfolio gradually coming into play, with our new organization focused on customer and market operations, as well as global operations ensuring the timely delivery, we should be in a position to see the benefits of this improved portfolio in sales, market share, and margin towards the end of the year.

(Am. Compl. ¶ 173; Defs.' Ex. U)

b) An analyst posed a question to Ollila, "just sort of strategically, obviously you guys are after big market share, you really understand and recognize the market dynamics, early on you mentioned earlier in the last year that you guys need clamshells. So any thoughts on what happened between – that accounts for a little bit of a pause in the product lineup right now? Are there some unforeseen software development issues that you're finding out it's taking longer for some of the people to bring out the new products or how do you sort of – what do you see that the mistake maybe we made in terms of the product portfolio currently? Is it sort of more of a short term? Is it more of a strategic decision because clam shells tend to have lower margins? Can you kind of walk us through, so it helps us to understand a little bit kind of going forward

what will change and why it will change?"  (Defs.' Ex. U)  Ollila responded:

> *I don't think there is anything which either would have been a sort of big mistake in terms of addressing the technologies or such, or that there would have been a big problem in either one software area or one hardware or whatever.  I think the transition that the industry is technologically going underway means that there are* a lot of architectural issues which we have had, which one would call legacy issues, *which we have addressed but which has taken a little bit more time to then implement in products.*  And this includes phone factors, this includes a number of other things.
>
> So there are architecture issues which have led into some execution delays so that we would have liked to be sort of six months ahead ideally with some of our product lines.  Some of our product introductions.  But it's not that there was a glitch which put a brake on everything.  It's just a transition that is very much underway and which I suppose could have been that for somebody who is there without a legacy could have addressed somewhat differently.
>
> (Am. Compl. ¶ 174; Defs.' Ex. U)

d) Another analyst recognized Nokia's "mid-range product gap" and asked whether the "competition is just tougher than it was" previously or that the overall market "is just lower end and, therefore, you have to fight harder with pricing and things like that?"  (Defs.' Ex. U)  Ollila responded:

> *I don't think it is that fundamental . . . one sort of has to – when we look at the fourth quarter, and look at the margin, the position we were in in the fourth quarter, both in margins, as well as pretty healthy growth and now capability to deliver, so there is some change in how our products fared against the mid-tier offering.  So if you have four competitors, and when we have a bit of a hole here and there, and each of them fills in one hole, then we're against certainly all of them and not against one competitor, and this is the picture more than anything else.*  And there is a major mid-tier market which is kind of, since we have those holes, not enabled us to move from low-end to mid-end in the upgrade market and that then hits the ASP and the total revenue line.

(Am. Compl. ¶ 175; Defs.' Ex. U)

e) Later in the earnings call, another analyst asked about the increasing importance of operators in controlling the value chain. Ollila responded:

> I think the relationships that we are enjoying with the operators are continuing to improve in terms of how we are working with them on a practical level, but obviously, that is not immediately or short-term necessarily reflected in the purchasing position, so there will be a lot of fluctuation. *It is very difficult to forecast what is happening there.*

(Am. Compl. ¶ 176; Defs.' Ex. U)

15. A Morgan Stanley Equity Group Report, dated April 28, 2004, outlines its company update of Nokia after meeting with Pekka Ala-Pietila. The report states:

> [T]he shortfall in [Nokia's] mid range product line-up surfaced back in 3Q03 and was not only related to 1Q04. *Component constraints in 4Q03 has masked its weakness there: Nokia's strong supply chain relationships enabled it to deliver product when competitors could not.*
>
> It seems that Nokia now believes it underinvested in the mid end and over-invested – too much and too early – in its new domains, Multimedia and Enterprise.
>
> . . . .
>
> *Nokia now recognises that it has not been willing to comply with operators demands in the past – in other words, customize phones for operators – but has been more willing to do so in recent quarters.* Nokia has recently spent more time "clearing the air" with some operators started through more active and open dialogue.

(Am. Compl. ¶¶ 177-78; Defs.' Ex. L)

16. The CAC alleges that in a second quarter 2004 Earnings conference call with analysts, Ollila

said:

> While out product portfolio is gradually improving, we are still not in where we want to be. Therefore, we have taken certain specific action. First, we have spent a great deal of time and energy in owning our product roadmaps. The product portfolio will continue to gradually improve throughout this year and I strongly feel, based on what we have in the pipeline, that we will make a huge improvement starting in the fourth quarter. Secondly, we have heightened our ambitions in the technology roadmaps and product specifications, which means greater emphasis on best-in-class technology implementations like Wideband CDMA, displays, and cameras. We are also paying special attention to our abiity to support the operators in their differentiation needs.

> (Am. Compl. ¶ 179)

17. The CAC further alleges that on or about August 9, 2004, Handelsbanken Capital Markets analysts met with a Nokia Vice President of marketing for mobile phones.

  a) The analysts' report said:

> Nokia admits that its portfolio has been weak since Q3 2003, and that its success in Q4 2003 was from the weakness in competition.

  b) The report said that by this "admission," Ollila acknowledged that:

> Nokia's earlier refusal to support the operators in their differentiation needs had harmed sales.

> (Am. Compl. ¶ 180)

18. The CAC also alleges that on September 9, 2004, Richard Simonson, Nokia's CFO, held an analyst conference call. On this call, the CAC alleges, Simonson "suggested that Nokia's higher earlier reported sales in Europe may have been a result of deliveries into the channel that had not then been sold to consumers – *i.e.*, the difference between the 'sell-in' and 'sell-out'":

> Going back to second quarter, specifically to your question on

Europe and the sell in, sell out, we have said there had been a sequential decline in sell in, but our sell out we had very good positive signs there, indicating that we have had a 3.5 million additional clearing of the inventory, *i.e.*, sell out. So that it where we were in the second quarter.

(Am. Compl. ¶ 180)

19. The CAC also alleges that on November 3-4, 2004, Nokia held its annual Capital Markets Day event for market analysts in New York City. During that conference, the CAC alleges, Ollila made comments about Nokia's changing relationship with its key customers:

When we speak about operators and especially key or mega operators, big operators, we had done a fair, a bit of soul-searching how we can find a way to work together and how we can find a way to configure to their business success. It's a bit funny to use the following words in front of this audience but internally we use that and we say that the results of the outcome from that soul-searching is actually that, it's – we have to love and care for our key customers. . . . Customization is something which has been part of the discussions for long with operators. In some areas, it has been easier for us to respond to the requests but there has been many areas which have been quite challenging for us to be responsive.

(Am. Compl. ¶ 182)

## II. DISCUSSION

### A. Motion to Dismiss

In considering a motion to dismiss under Rule 12(b)(6), the Court "accept[s] all of the plaintiffs' factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiffs. Dismissal is proper if, accepting all the allegations in the complaint as true and drawing all reasonable inferences in plaintiff's favor, the complaint fails to allege any set of facts that would entitle plaintiff to relief." *In re Sharp Intern Corp.*, 403 F.3d 43, 49 (2d Cir. 2005)

(quotations and citations omitted). In addition to the facts set forth in the complaint, the Court may also consider documents attached to the complaint and/or incorporated by reference in the complaint, *see Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys.*, 155 F.3d 59, 67 (2d Cir. 1998), as well as matters of public record. *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998).

Securities fraud claims brought under Section 10(b) and Rule 10b-5 are subject to the heightened pleading standards required by Federal Rule of Civil Procedure 9(b). *See Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). The Second Circuit has established that to state a claim for relief under Section 10(b) and Rule 10b-5, Rule 9(b) requires a complaint to: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach*, 355 F.3d at 170.

The Private Securities Litigation Reform Act ("PSLRA") further modifies the Rule 12(b)(6) analysis when reviewing a complaint in a securities fraud action. Under the PSLRA, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Second, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Third, the PSLRA provides a safe harbor exception for claims

involving a "forward-looking statement" accompanied by adequate cautionary language.  *See* 15

U.S.C. § 78u-5.

### B.  Section 10(b) and Rule 10b-5 Claims

Rule 10b-5 states, in part, that it is "unlawful for any person . . . to make any untrue

statement of a material fact or to omit to state a material fact necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading."  17

C.F.R. § 240.10b-5.  To state a claim for relief under Section 10(b) and Rule 10b-5, Plaintiffs

must adequately allege (1) that Defendants made misstatements or omissions of material fact, (2)

with scienter, (3) in connection with the purchase or sale of securities, (4) upon which plaintiffs

relied, and (5) that plaintiffs' reliance was the proximate cause of their injury.  *See Dura Pharm.,*

*Inc. v. Proudo*, 544 U.S. 336, - -, 125 S.Ct. 1627, 1631 (2005); *Lentell v. Merrill Lynch & Co.*,

396 F.3d 161, 172 (2d Cir. 2005).

Here, Defendants contend the Consolidated Amended Complaint fails to identify any

actionable statements.  Defendants assert that the statements identified in the CAC are not

actionable because:  (1) Plaintiffs failed to adequately explain the reason(s) why the alleged

misstatements were false when made; (2) the alleged misstatements are immaterial statements of

corporate optimism or expressions of puffery; and/or (3) the alleged misstatements are protected

under the "bespeaks caution" doctrine or the PSLRA's safe harbor provision.  In addition,

Defendants contend that the CAC should be dismissed because it fails to adequately plead

scienter.

### 1.  Material Misstatements and Omissions

Plaintiffs allege that Defendants made numerous statements that were materially

misleading, because the statements were optimistic about Nokia and its products when it was under an affirmative duty to disclose negative information about Nokia's prospects. Defendants counter, that the statements alleged to be misleading are not actionable because they were true when made, mere puffery, or protected under the PSLRA safe harbor provision or the common law "bespeaks caution" doctrine. These statements, alleged by Plaintiffs to be actionable, can be broken down into two categories — those made or issued by Defendants that purportedly discussed contemporaneous or historical events, and those offering predictions of Nokia's future profitability and growth. While there is some overlap in the analysis of these types of statements, there are differences as well.

### (a)  Present Fact Statements and Backward Looking Statements

The first category to be addressed is Defendants' statements relating to current or historical events. Under the pleading requirements, a complaint must explain, with adequate specificity, why the alleged false or misleading statements were actually false or misleading when made. *See Rombach*, 355 F.3d at 170. Further, the complaint must establish the materiality of the omissions or misstatements. *See Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) ("[I]n order to prevail on a Rule 10b-5 claim, a plaintiff must show that the statements were *misleading* as to a *material* fact. It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant."). An alleged misrepresentation or omission is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) (citations omitted). "A statement can also be misleading, though not technically false, if it

amounts to a half-truth by omitting some material fact." *Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274, 294 (S.D.N.Y. 2004). Although obvious, it also bears noting that "[i]t is well settled that a complaint alleging violations of the securities laws may not rely upon statements that are true . . . ." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 557 (S.D.N.Y. 2004).

Plaintiffs allege that a number of Defendants' statements about current or past events were false or misleading. These allegations focus on Defendants' statements regarding the competitiveness of Nokia's phones, Nokia's progress in CDMA, its success in camera phones, the market's response to the N-Gage gaming device, and Nokia's relationship with its operators. Yet, Plaintiffs fail to adequately allege how or why many of these statements were either false or misleading. For example, Plaintiffs repeatedly allege that Nokia knew its positive fourth quarter 2003 phone ASPs were due to component shortages that hurt its competitors and allowed Nokia to gain market share. (Am. Compl. ¶¶ 99(a), 114(a), 118, 128(d)) Yet, Plaintiffs assert, despite this knowledge, Nokia misleadingly attributed its strong fourth quarter 2003 ASPs and volume growth to its good product mix. Without the component shortage affecting its competitors, Plaintiffs allege, Nokia's market share growth would not have been as pronounced. Plaintiffs fail to recognize, however, that in the January 22, 2004 earnings call quoted in the CAC, Ollila noted the component shortages in the market, its effect on Nokia, and how Nokia could not take full advantage of the shortages. As Ollila stated, "[t]he higher than expected robust industry demand during the fourth quarter [of 2003] resulted in a very healthy level of channel inventories at year-end. In spite of some tightness of supply in the market, we were able to deliver according to our plan but our ability to capitalize on the upside during the biggest sequential volume ramp-up in

44

the history of [the] mobile industry was limited." (Am. Compl. ¶ 125; *see supra* Part I.B.5(b))

Therefore, it is clear that Nokia did attribute at least some of its higher fourth quarter ASP to the

component shortage. At worst, Plaintiffs can only truly claim that Ollila's read of the market

dynamics of the fourth quarter of 2003 proved to be wrong. That, however, does not mean he

knew it was wrong at the time he made this comment.

In fact, the CAC utterly fails to assert when Defendants allegedly knew to what degree the

component shortages contributed to its higher ASPs. At oral argument, the best Plaintiffs could

allege was that statements made by Defendant Ollila on April 16, 2004, several months after the

allegedly false statements were made, show that Nokia made knowingly false statements about

its ASPs. (Hr'g. Tr. 70-74, Jan. 27, 2006 ("1/27/06 Tr.")) This allegation is mere conjecture.

The statement Plaintiffs referred to at argument, but which was not cited in the CAC, comes from

Nokia's first quarter 2004 Earnings Conference Call. (Defs.' Ex. U) On this call, an analyst

asked Ollila:

> It seems as though in the mid range the problem really relates to
> the Series 40 platform introduced in 2002 competing against newer
> products introduced by essentially all of your competitors with new
> platforms for the second half of 2003. My question comes in, on,
> why did it take so long for those products to have this impact on
> you? It's been a couple quarters since we first saw these
> introductions, yet, really in the numbers I've seen, in terms of
> European sales, we aren't really getting an inkling of it until really
> February. So why did it take so long?
>
> Second of all, given the new products came out in the second half
> of last year, wouldn't it have – why weren't the aggressive actions
> that you're going to be taken in the second quarter begun sort of
> earlier in anticipation of this, some thinking about that, or at least
> the ability to sort of prepare us for what might have happened.
>
> (Defs.' Ex. U)

Ollila responded:

> I think, Paul, obviously, we are working on a continuous basis and not one-off in terms of our shaping up our portfolio, so you can be assured that we're working hard, so not resting and waiting for problems to occur. And I think the comment on why did it take so long, until February or so, sort of six months, or whatever, I mean, I think, one of the things that really does come to mind, and this is not at all encompassing answer, I don't think there's a right or wrong answer here, by the way, but if I venture an answer here, it must come around delivery capability.
>
> If you see an excellent product, as we have seen for ten years from so many people, then they haven't been able to ship, in terms of millions, and we have had a very good delivery capability with our product which have put is in a good position, as it did in the fourth quarter, and then you might say that this was different towards the end of the first quarter, and, I'm just offering this as one alternative and one possible explanation. I don't think there's a right or wrong answer in this respect.
>
> (Defs.' Ex. U)

These statements provide no basis to allege that Defendants' earlier statements about its ASPs were knowingly false when made. First, Ollila's equivocal comment, made in April, lends no support to Plaintiffs' contention that Ollila knew back in January 2004 (the latest the ASP statements noted above were made) to what degree Nokia's delivery capabilities accounted for its rising ASPs.[8] Second, as with many of the statements Plaintiffs rely upon, Ollila's answer here

---

[8] The only post-January 2004 statement regarding ASPs that Plaintiffs allege is false was made on March 17, 2006. (*See* Am. Compl. ¶ 153; *see also* Part I.B.9(c)) Plaintiffs do not allege the March 17 statement is false because of Nokia's distribution advantage over its competitors, rather, Plaintiffs allege it was false because by that date Nokia's "phone ASPs were sharply dropping as a result of the absence of mid-tier and high-end competitive products in its phone portfolio." (Am. Compl. ¶ 154) For different reasons, this allegation also fails to properly allege how Defendants' statement was false. This statement merely acknowledges the unsurprising fact that Nokia's higher priced phones had higher ASPs than its "normal" phones, and therefore, the more higher priced phones Nokia sold would result in an overall higher ASP for Nokia's overall

merely acknowledged that one possible after-the-fact rationalization to explain Nokia's drop-off in the first quarter of 2004 as compared to fourth quarter of 2003 is that Nokia had a distribution advantage over its competitors. Ollila in no way claimed that Nokia's superior distribution capabilities were the sole reason for Nokia's higher ASPs in the fourth quarter of 2003, or that Ollila had contemporaneous or nearly contemporaneous knowledge of his competitors' comparative supply problems. Rather, Ollila merely acknowledged, with a tint of hindsight, that Nokia's distribution advantage might have played some role in its higher fourth quarter 2003 ASPs. Thus, these statements are not actionable.

Similarly unpersuasive are Plaintiffs' allegations about Nokia's statements concerning its efforts to improve its product mix. "'Defendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy.'" *In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478, 2003 WL 22801416, at *6 (S.D.N.Y. Nov. 25, 2003) *aff'd sub nom. Nadoff v. Duane Reade, Inc.*, 107 Fed.Appx. 250 (2d Cir. 2004) (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999)). As logic dictates, "'disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future.'" *Id.* (quoting *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 401 n.3 (6th Cir. 1997)).

With these principles in mind, it is clear that many of Plaintiffs' claims regarding Defendants' statements about the Nokia product mix fail as a matter of law. For example, the CAC repeatedly alleges that Defendants' positive statements about its CDMA products were false because Nokia was not as strong as its competitors across all segments of the CDMA

phone sales.

market.  Specifically, Plaintiffs assert that Nokia's October 16, 2003 statement that "following an announced commitment two years ago to strengthen Nokia's position in the global CDMA handset market," Nokia "doubled its share to the mid-teens from the same quarter last year," and that Nokia expected "to see continued momentum in CDMA going into the fourth quarter" was false at the time it was made.  (Am. Compl. ¶ 86; *see supra* Part I.B.1)  Plaintiffs argue this statement was false because Nokia was not adapting as quickly as its competitors to the demand for CDMA phones and Nokia was only able to compete in the low-end CDMA market.  (Am. Compl. ¶ 87)  While Nokia may not have adequately anticipated the shift to CDMA, the CAC does not challenge the accuracy of the historical statement, Nokia's growth in the CDMA market, or that this growth was, at the time, a legitimate and reasonable basis for an optimistic outlook.  *See San Leandro Emergency Med. Plan. v. Philip Morris, Co.*, 75 F.3d 801, 812 (2d Cir. 1996) (disclosure of adverse information three weeks after positive representation was made is insufficient to support a finding that the prior statement was false when made).  Instead, Plaintiffs essentially allege the statement was misleading because, disregarding Nokia's progress in the CDMA market, it still lagged behind its competitors.  To state, in retrospect, that a company could have done better is not the same as alleging that positive statements were false when made.  *See In re Bayer AG Sec. Litig.*, No. 03 Civ. 1546, 2004 WL 2190357, at *11 (S.D.N.Y. Sept. 30, 2004) (accurate statements of "strong sales" records are not actionable "since they are merely recitations of historical fact and are not alleged to be inaccurate.").  Put another way, a company can accurately state that its products are competitive, and proclaim that it believes its fortunes are heading in the right direction, even if the company's competitors have higher market share or profit margins.

48

Defendants were also candid with the market about its near-term prospects in the CDMA market and how it viewed its past performance in this area. During the Class Period, Nokia specifically recognized that it had historically under-invested in CDMA technology, and therefore decided to increase its CDMA investment in 2000. (Am. Compl. ¶¶ 102-03; *see supra* Part I.B.3(b), (c)) As a result, Defendant Kallasvuo explained, Nokia made good progress in CDMA, enough to double its market share. (Am. Compl. ¶¶ 102-03; *see supra* Part I.B.3(b), (c)) This set of statements is particularly revealing because in it Nokia explicitly recognized its historical slowness in responding to consumer demand for CDMA and how, as a result, it committed to becoming more competitive in CDMA. The fact that Nokia still had room to improve its CDMA offerings, as alleged by Plaintiffs, cannot make Nokia's statements that it was competitive in this area misleading. To be competitive in a market segment, especially in an area in which a company recognizes it has had recent failures, cannot mean to a reasonable investor that the company does not have room to improve or even that it has captured the top market share in the particular market segment. For similar reasons, Plaintiffs fail to properly allege how the other statements in the CAC about CDMA or its product strength, including its camera phones, were false when made. Accordingly, statements 2(a), (e), 3(d), (g), 6(b), (c), 7(a), 8(a), 10, 11 (*see supra* Part I.B) (corresponding to Am. Compl. ¶¶ 89, 92, 105, 113, 132, 135, 141, 145-46, 156-57) are not actionable.

As noted above, not being as competitive as other companies does not restrict a company from being reasonably optimistic about its future prospects. Yet, in connection with Nokia's launch of the N-Gage gaming device, Plaintiffs allege that Defendants' statements were false or misleading because Nokia's statements about the launch were positive while "consumers'

49

immediate response to N-Gage was highly negative and those sales that were made relied heavily on promotional discounts." (Am. Compl. ¶ 109) As with many of Defendants' statements discussed throughout the CAC, Plaintiffs selectively edited Defendants' full statements regarding the N-Gage. The statements about the N-Gage launch, in context, admitted that Nokia was working on the problems that customers had with the original product and were looking to make it profitable in the following years. Indeed, rather than being overly optimistic about the N-Gage, Defendants told investors that it did not expect to know whether the N-Gage was a success for another three Christmas seasons, that it was working on fixing consumers' problems with the product, and expected to have the improved product for the 2004 Christmas season. (Am. Compl. ¶¶ 107-08; *see supra* Part I.B.3(d)-(e)) Nokia also acknowledged that the N-Gage's price was initially set too high, (Am. Compl. ¶ 151; *see supra* Part I.B.9(b)) and that it did not have a wide offering of games for the N-Gage at the time of its launch, but by the end of 2004 it planned on having 100 games available. (Am. Compl. ¶¶ 105, 107; *see supra* Part I.B.3(d)) Thus, contrary to Plaintiffs' assertion, Nokia never represented that the N-Gage was an outright success and was quite frank about the N-Gage's shortcomings. Accordingly, statements 3(d)-(e), 9(a)-(b) (*see supra* Part I.B) (corresponding to Am. Compl. ¶¶ 107-08. 150-51) are also not actionable.[9]

---

[9]Plaintiffs' allegations regarding Nokia's relationship with operators (Am. Compl. ¶¶ 110, 148; *see supra* Part I.B.3(f), 8(b)), Nokia's Risk Factors (Am. Compl. ¶ 130; *see supra* Part I.B.6(a)), and the Symbian Operating System (Am. Compl. ¶ 136; *see supra* Part I.B.6(d)) are also not actionable because they are all non-forward-looking statements that Plaintiffs fail to adequately why they were false when made. For example, at the Capital Markets conference, Defendant Vanjoki was asked about Nokia's relationship with operators and how it might need to change in order to not dilute Nokia's high brand value. (Defs.' Ex. M; *see supra* Part I.B.3(f)) In his response, Vanjoki generically praised the positive value of cooperation in business and noted how cooperation will play a role in Nokia's ability to capitalize on its relationships with operators. (Am. Compl. ¶ 110; *see supra* Part I.B.3(f)) Plaintiffs find particularly misleading the portion of Vanjoki's statement where he said, "[t]his is what we have found with the big operator

(b)  Forward-Looking Statements

The next category drawing fire from Plaintiffs is forward-looking statements by

Defendants.  Specifically, Plaintiffs allege that a number of these statements were materially

misleading because they were unrealistic given Nokia's business model and sales data.  In

reviewing forward-looking statements, courts are instructed to consider the total mix of

information and are supposed to "bear in mind that disclosure requirements are not intended to

attribute to investors a child-like simplicity.  Rather, investors are presumed to have the ability to

be able to digest varying reports and data."  *In re Nokia Corp. Sec. Litig.*, No. 96 Civ. 3752, 1998

WL 150963, at *6 (S.D.N.Y. Apr. 1, 1998) (quotations and citations omitted).

Statements that, in retrospect, were inaccurate or were too highly optimistic do not

typically constitute material misstatements.  *See Rombach*, 355 F.3d at 174 ("[E]xpressions of

puffery and corporate optimism do not give rise to securities violations." (citation omitted)).

"The corporate puffery rule applies to loose optimism about both a company's current state of

affairs and its future prospects."  *Fitzer v. Security Dynamics Tech., Inc.*, 119 F. Supp. 2d 12, 23

(D. Mass. 2000) (citation omitted).  The Second Circuit recognizes that "[u]p to a point,

---

groups around the world where the main driver in fact is the trustworthiness of the partners and
the behavior that you show."  (Am. Compl. ¶ 110; *see supra* Part I.B.3(f))  Plaintiffs assert that
this statement is false and/or misleading because Nokia's major operators "were purchasing
significantly fewer phones from Nokia, and providing less promotional and advertising support
because of Nokia's refusal to customize its phones to their specifications . . . ."  (Am. Compl. ¶
111)  Essentially, Plaintiffs contend that Vanjoki's statement was false because Nokia's
relationship with operators could have been better.  The fact that Nokia's relationship with
operators could have been better does not make Defendants' barely positive statement about its
current relationship with operators false.  Moreover, Plaintiffs' assertion that Nokia's
relationship with operators was poor is belied by its own Complaint, which acknowledges that in
2003 Nokia specifically agreed to customize its phone for Vodafone, the leading European
operator.  (Am. Compl. ¶ 57)

companies must be permitted to operate with a hopeful outlook," and that as a result, executives "are not required to take a gloomy, fearful or defeatist view of the future" *Rombach*, 355 F.3d at 174 (quotations and citations omitted); *see also In re QLT Inc. Secs. Litig.*, 312 F. Supp. 2d 526, 532 (S.D.N.Y. 2004) ("The PSLRA deems generalized expressions of corporate optimism immaterial as a matter of law and therefore insufficient as the basis for an action alleging securities fraud."); *In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *4 (holding that an actionable statement "must be one of existing fact, and not merely an expression of opinion, expectation or declaration of intention." (quotations and citations omitted)).  The limitation on this principle is that optimistic projections of future performance may be actionable upon a showing that the defendants did not genuinely or reasonably believe the positive opinions they touted (i.e., the opinion was without a basis in fact or the speakers were aware of facts undermining the positive statements), or that the projections imply certainty (i.e., they were not actually projections).  *See In re Int'l Bus. Mach. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998); *Elliot Assoc. L.P. v. Covance, Inc.*, No. 00 Civ. 4155, 2000 WL 1752848, at *10 (S.D.N.Y. Nov. 28, 2000); *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D 133, 141 (S.D.N.Y. 1999).

Under these standards, none of the forward looking statements in the Consolidated Amended Complaint is actionable.  For example, the statement that "[w]e expect to see continued momentum in CDMA going into the fourth quarter as we increase shipments to China, India, and all U.S. CDMA operators," (Am. Compl. ¶ 86; *see supra* Part I.B.1) is not actionable because it is a general statement of optimism that is not alleged to be without a basis in fact.  Other statements about Nokia's positive outlook for developing its CDMA phones are likewise

not actionable.  For example, Defendant Ollila was optimistic about Nokia's CDMA phones, stating, "we want to be present in all the key segments of the CDMA market. . . . [I]f we look at the form factors, we will be moving to a broader set of form factors, also with CDMA, including clamshells with time.  So, you will see all of that. . . . And if we look at the broader set of products and opportunities in CDMA, we are working with a number of multimedia segment products which will hit the market in 2004 and 2005.  So, the product road map is a very exciting one and it has all the same elements with time that our GSM wideband CDMA portfolio does have."  (Am. Compl. ¶ 91; *see supra* Part I.B.2(c))  Plaintiffs allege these CDMA projections were misleading because Nokia lagged behind its competitors in this market segment and that the purported strength of Nokia's road map was false because Nokia's products were noncompetitive and "lacked form designs such as clamshells that Nokia's customer surveys had indicated were in high demand."  (Am. Compl. ¶ 194)  Plaintiffs fail to note, and again disturbingly leaving out of their selective quotations of Defendants' statements in the CAC, that Nokia expressly cautioned in these very statements (included here in full at *supra* Part I.B) that its goals of introducing clamshells and further developing a competitive product road map would only occur "with time." (*See supra* Part I.B.2(c))  Moreover, the Court is unaware of any authority, and Plaintiffs fail to cite any authority, that it is improper for corporate officials to be hopeful that it will be competitive in the future.  Accordingly, these and other similar vaguely positive statements regarding Nokia's hopeful outlook for its CDMA phones and its other new products including camera phones, statements 2(b), 3(a), (b), (d), (g), 5(a), 7(a), 10, 11 (*see supra* Part I.B) (corresponding to Am. Compl. ¶¶ 90, 96-98, 102, 105, 113, 120, 141, 156-57), are non-

actionable expressions of corporate optimism.[10]

The Consolidated Amended Complaint also alleges Defendants' optimistic statements about Nokia's general business outlook were false. For example, Ollila, in projecting Nokia's fourth quarter 2003 and beyond, said, "[o]ur distribution strategy [is] bearing fruit and Nokia brand is stronger than ever supported by competitive product offering from low end to localized feature-rich devices . . . . Outlook for the fourth quarter indicates a further acceleration of the market to year-on-year growth in the mid-teens culminating in full year 2003 volume of 460 million units. I expect Nokia volume growth in the fourth quarter to exceed the overall market growth. . . . I'm looking forward to a quarter that is expected to bring Nokia new volume and market share records." (Am. Compl. ¶ 89; *see supra* Part I.B.2(a)) The underlying facts in this statement are not alleged to be false, yet Plaintiffs contend that the statement was false because by the third quarter of 2003 Nokia's products in development were "inadequate and noncompetitive and lacked form designs such as clamshells that Nokia's customer surveys had indicated were in high demand." (Am. Compl. ¶ 94) Again, to be competitive does not mean, nor even suggest, that the company thinks it will lead the market in every product line and market segment or be the most successful company. Also, Defendants did not hide the fact that Nokia was slower to embrace clamshell phone designs as it specifically acknowledged in Class Period

---

[10]For similar reasons, Nokia's general statement of corporate optimism regarding Nokia's relationship with Vodafone is also not actionable. (*See* Am. Compl. ¶ 148; *see supra* Part I.B.8(b)) ("[W]e're very pleased with the dialogue we have had with Vodafone . . . because we have some very good, very interesting, exciting discussions underway as Arun [Arun Sarin, Vodafone CEO] indicated about how we can get new products . . . and, we will work very well with a number of our other operator customers because that's the way the collaborative approach needs to work, going forward, and, and I think the Vodafone and Nokia cooperation has been really exemplary in the respect.")

statements its intent to become more competitive in clamshells with time.  (*see supra* Part I.B.2(c), 3(c))  Under this analysis, Plaintiffs' allegations regarding Nokia's optimistic outlook for its business merely attempt to plead fraud by hindsight.  Therefore, the CAC's other allegations related to Nokia's optimistic outlook for its product positioning and future growth (Am. Compl. ¶¶ 127, 159; *see supra* Part I.B.5(g), 10) are for the same reasons not actionable.

Similarly, when discussing the N-Gage's entry into the market, only a couple of months after it was introduced, Defendants explained, "[i]t's not going to be one Christmas phenomenon and we are not expecting that the first Christmas is going to make it for us.  But when we have gone through three cycles, i.e. three Christmases – because game industry peaks to the tune of Christmas – then we can say whether we have this market in the pocket or not.  The starting is very good.  We are attracting this business, we are seeing repeat orders come in, and in certain markets, which are more attuned for this, we see the whole thing starting to work just as we have planned."  (Am. Compl. ¶ 107; *see supra* Part I.B.3(d))  Five months after the N-Gage's introduction Defendants further noted:

> Our expectation at the time [the N-Gage was introduced] was that
> it will be hard, it will be challenging, and it will be interesting.
> And we certainly receive[d] what we've expected.  But also, what
> we've expected is consumer behavior online, and we've also
> received that.  So from an online perspective, it's truly been also
> what we've expected. . . .  And clearly we've broken the ice on the
> online area with the rich games of N-Gage.  But ensuring on the
> mobile online story is the fact that N-Gage is also the number one

device on downloadable games, as you can see of the statements of some of our stakeholders. Whether it's Java games or Symbian downloadable games, you can always say that has been a success. For us, again, that's a very assuring, because the N-Gage device is actually used for what it was intended to be used for, mobile gaming. It's the right track and we're building on it."

(Am. Compl. ¶ 150; *see supra* Part I.B.9(a)) Plaintiffs allege these statements were materially false "because N-Gage had been a failure from the first month of its introduction. The device was ill-designed as a phone for playing games, and the devices delivered in 4Q03 remained stuck in retail channels to 2004, and only sold after they were highly discounted." (Am. Compl. ¶ 152) It is hard to understand how Nokia's statements regarding the N-Gage were false or misleading, when Nokia explicitly said that it would not know whether the N-Gage was a success for another three years. It is quite unbelievable, and somewhat arrogant, to state in hindsight that Nokia's cautiously optimistic statements shortly after the release of a wholly new product were false because the product was a "failure from the first month of its introduction." Plaintiffs provide no basis, other than their own general conclusory allegations, to reasonably construe Nokia's statements that it would build off of the launch of the N-Gage for the next few years as anything but a cautiously optimistic statement. These are exactly the kind of hopeful statements, tinged with caution, that cannot reasonably be found to be misleading and therefore relied upon to allege violations of the securities laws. *See San Leandro*, 75 F.3d at 811; *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d at 557 (listing cases).

## 2. Bespeaks Caution Doctrine and the PSLRA's Safe Harbor Provision

Forward looking statements are also protected by the "bespeaks caution" doctrine and the PSLRA's safe harbor provision. The "bespeaks caution" doctrine refers to the use of cautionary language aimed at warning investors of potential risks that may occur in the future. *See Stolz Family P'Ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004). Under the bespeaks caution doctrine, however, "a complaint fails to state a claim of securities fraud if *no reasonable investor* could have been misled about the nature of the risk when he invested." *Halperin*, 295 F.3d at 359. Obviously, a party cannot use cautionary words to immunize itself from representations of "[h]istorical or present fact." *Stolz*, 355 at 97; *see also Rombach*, 355 F.3d at 173 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

In order to be effective, cautionary language needs to warn of, or directly relate to, the risk that brought about the plaintiff's loss. *Halperin*, 295 F.3d at 359. If the cautionary language is sufficient, courts are instructed to read the alleged fraudulently misleading statements along with the cautionary language, and then test whether a "reasonable investor could have been misled into thinking that the risk that [ultimately] materialized and resulted in his loss did not actually exist." *Id.* The key question on a motion to dismiss, after considering the defendant's representations or omissions and the cautionary language present, is "whether plaintiffs have overcome the existence of such language." *Id.*

Similarly, the PSLRA safe harbor provision provides that no liability attaches to certain forward-looking statements made by an issuer. *See* 15 U.S.C. § 78u-5(c). In order to receive such protection, statements must be forward looking, be identified as forward looking statements, and be accompanied by meaningful cautionary language identifying important factors that could

cause actual results to differ materially from those in the forward looking statements.  15 U.S.C. § 78u-5(c)(1)(A)(i).

The bespeaks caution doctrine is applicable to a number of statements in this case.  For example, the October 16, 2003 statement "[w]e expect to see continued momentum in CDMA going into the fourth quarter . . . ," (Am. Compl. ¶ 86) is clearly forward looking.  Plaintiffs allege this statement was false because (1) the market shift to CDMA was harming Nokia's sales and market share, (2) by this point in 2003 Nokia had only developed low-end CDMA phones and was behind its competitors in developing high-quality CDMA phones by refusing to license other vendor chipsets, and (3) Nokia refused to customize its CDMA phones.  (Am. Compl. ¶ 87)  Accepting these "facts" as true does nothing to explain why Nokia's forward looking projection of momentum in its CDMA efforts was false, particularly in light of the accompanying cautionary language.

Specifically, along with these hopeful projections about the CDMA product line, the October 16, 2003 press release clearly and unequivocally cautioned investors that statements preceded by words such as "expect" are forward looking that involve risks and uncertainties.  (Ex. O, 15)  The release also explicitly warned that results may differ from the projections due to numerous factors, including "the intensity of competition in the mobile communications market and changes in the competitive landscape," and "[t]here is a risk that we will not be successful in maintaining and developing [the] wide portfolio [of phones], or that the technologies and related products and solutions on which we focus may not be brought to market by us and/or mobile network operators as quickly as anticipated, may not achieve as broad a customer acceptance among operators or end-users as we expect, or may not prove to be sufficiently compatible with

the existing technologies and products of other product and solution providers." (Ex. O, 15) The release further cautioned that "the intensity of competition in the mobile communications market and changes in the competitive landscape" are factors that could cause Nokia's results to differ from its expectations. (Ex. O, 15) This cautionary language is not mere boilerplate as it directly relates to the risks that ultimately are alleged to have, in part, brought about Plaintiffs' losses – namely, the competition in the higher-end CDMA phones. That these warnings are sufficiently particular speaks to the generic nature of Plaintiffs' allegations. Plaintiffs cannot make generic allegations in their Consolidated Amended Complaint and then dismiss any cautionary language by asserting that the warnings were "wholly generic." (Pls.' Br. 26) As alleged in the CAC, Nokia apparently was not able to bring to market as quickly as it hoped popular cell phones and could not compete in certain market segments as well as it desired due to increasing competition, i.e., it was not as successful as it specifically warned it might not be, in the mid- and high-end CDMA phone market. The fact that these risks turned out to be true does not make Defendants clairvoyant, but rather, it demonstrates that Nokia adequately imparted to its investors the potential risks the company foresaw that may affect its results.

Similarly, Defendant Ollila's cautiously hopeful outlook for Nokia's projected market share for Europe in the first quarter of 2004, (Am. Compl. ¶ 127; *see supra* Part I.B.5(g)) when read alongside its accompanying cautionary language, (Defs.' Ex. D. 11-13) could not have misled a *reasonable* investor into thinking that the risks Plaintiffs identify did not exist. For example, Defendant Ollila said that Nokia's product positioning in Europe during the fourth quarter of 2003, particularly in the high-end of the market, "worked really well." (Am. Compl. ¶ 127; *see supra* Part I.B.5(g)) Yet, he also recognized that Nokia did not do as well as it had

hoped in the low-end of the market, but it remained hopeful that the momentum from the fourth

quarter of 2003 could translate to better results for the first quarter of 2004 in Europe.  (Am.

Compl. ¶ 127; *see supra* Part I.B.5(g))  As noted earlier, this statement, even without extra

cautionary language, is not actionable because it is exactly the kind of hopeful statement,

tempered with caution, that cannot reasonably be found to be misleading and therefore relied

upon to allege violations of the securities laws.  (*See supra* Part II.B.1(b))  The statement is also

not actionable because its accompanying cautionary language, identified in Nokia's 2002 Form

20-F, (*see supra* n. 4) specifically warned investors that "the markets for [its] products and

solutions are intensely competitive," and that its "competitors, including many new market

entrants, may implement new technologies before we do or strengthen their footing in the

delivery of existing technologies more rapidly than we" do.[11]  (Defs.' Ex. D 12)  Accordingly,

these warnings, alerting investors to the risks competitors could pose in this highly competitive

and fast-moving market, were sufficiently specific to find Ollila's forward looking statement

about Nokia's 2004 Europe projections not actionable.

Reviewing similar optimistic statements in the context in which they were made along

with the accompanying cautionary statements that bespoke caution, the Court finds as a matter of

law that none of these statements could mislead a reasonable investor.  Thus, the other forward

looking statements relied upon in the CAC that were accompanied by specific cautionary

language are not actionable.  Accordingly, statements 1, 2(a), (c), 3(g), 5(a)) (*see supra* Part I.B)

_____

[11]The same 2002 Form 20-F language is referenced in Nokia's January 22, 2004
conference call (Defs.' Ex. C; *see supra* Part I.B.5) and the November 2003 Capital Markets Day
presentation (Defs.' Ex. M; *see supra* Part I.B.3).  Nokia's April 6, 2004 conference call also
referenced similar cautionary language in Nokia's 2003 Form 20-F.  (Defs.' Ex. I; *see supra* Part
I.B.12)  Nokia's 2003 Form 20-F's risk factors are stated more fully at *supra* Part I.B.7(b).

(corresponding to Am. Compl. ¶¶ 86, 91, 112-13, 120) are not actionable.

### 3. Scienter

Even if the Court were to find (1) that Nokia's statements were material and misleading, and (2) that those statements were not deemed immaterial by adequate warnings, the Consolidated Amended Complaint must still be dismissed because of Plaintiffs' failure to adequately plead scienter.

Having alleged that Defendants misled investors, Plaintiffs must also adequately plead scienter. To do so, the CAC is required to allege facts that give rise to a strong inference of intent to "deceive, manipulate or defraud." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (quotations and citations omitted). That intent can be established either by: (1) alleging facts showing Defendants had both motive and opportunity to commit fraud; or (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *See Rombach*, 355 F.3d at 176; *Ganino*, 228 F.3d at 168; *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). Lacking evidence of motive, Plaintiffs' Consolidated Amended Complaint only relies on the second prong of this test.[12] (Pls.' Resp. 28)

---

[12]The Consolidated Amended Complaint's allegations of scienter are solely based on Defendants' alleged knowledge that its statements "were false or misleading or acted recklessly in not determining their truth." (Am. Compl. ¶ 186-88) There are no allegations in the CAC that Defendants' scienter is based on any motive and opportunity to commit fraud. Further, Plaintiffs acknowledged in their Response that they only "rely on the second prong of this test [i.e., motive], as they have alleged strong direct and circumstantial evidence of both conscious misbehavior and recklessness." (Pls.' Resp. 28) Yet, elsewhere in their Response, Plaintiffs allude, for the first time, to a potential motive that "Nokia's officers would in fact personally benefit by manipulating sales to push Nokia's earnings into 2003, rather than 2004" because of a change to Nokia's compensation program. (Pls.' Resp. 38) Plaintiffs allege that under the compensation program introduced on January 22, 2004, Nokia would reduce the total number of stock options it would grant to its employees under its incentive program. (Pls.' Resp. 38 n.14) Plaintiffs do not attempt to explain why this was a motive for Defendants to make the allegedly

"In determining whether a strong inference of scienter has been pleaded, the Court must read the complaint *in toto* and most favorably to plaintiff." *In re Regeneron Pharm., Inc. Sec. Litig.*, No. 03 Civ. 3111, 2005 WL 225288, at *24 (S.D.N.Y. Feb. 1, 2005) (quotations and citations omitted). However, when motive is not apparent, as here, the "strength of the circumstantial allegations must be correspondingly greater" to satisfy the requisite pleading of conscious misbehavior or recklessness. *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (quotations and citations omitted).

A strong inference of conscious misbehavior or recklessness arises when defendants (1) engage in deliberate illegal behavior, (2) knew or should have known that they were misrepresenting material facts, or (3) failed to check information they had a duty to monitor. *Novak v. Kasaks*, 216 F.3d 300, 308-09 (2d Cir. 2000). In this context, recklessness is not "merely enhanced negligence." *In re JP Morgan Chase Sec. Litig*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005) (citation omitted). Rather, at the least, it is "'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to

---

false statements. Nor do they explain how this change, which post-dates most of the allegedly false statements alleged in the CAC, supplied motive for Defendants to make the allegedly false statements made prior to the new incentive program. Moreover, at oral argument Plaintiffs again acknowledged they "did not plead motive and opportunity [a]s defined under Second Circuit law." (1/27/06 Tr. 97) Yet, Plaintiffs still argued, the new incentive plan was useful to explain a "reason why Ollila misrepresented [Nokia's] success in 2003." (1/27/06 Tr. 97) This is illogical, because the allegedly false statements made in October and November 2003 pre-date the January 2004 change in Nokia's compensation plan. Further, any claim that Defendants' motivation to make the purportedly false statements that followed the January 22 change is also highly dubious. Essentially, Plaintiffs would have the Court believe, without any proof, that Defendants made numerous false statements before the incentive plan was changed in January 2004, and that these statements just happened to perfectly align with Defendants' almost identical statements after the January change was announced, all in order to keep Nokia's stock price inflated for shares Defendants are not even alleged to have sold. As Plaintiffs recognized at oral argument, this half-hearted attempt does not adequately plead motive.

62

the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.* at 624-25 (quoting *Kalnit*, 264 F.3d at 142).

Similar to the limitations on materiality, the Second Circuit has identified several limitations that apply to the scienter analysis. First, Plaintiffs cannot satisfy this pleading requirement with allegations of fraud by hindsight. *See Novak*, 216 F.3d at 309 ("[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." (citation omitted)). Second, "corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects. Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Id.* (citations omitted). Third, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." *Id.* (quotations and citations omitted).

Here, Plaintiffs argue that Defendants were reckless because they withheld information that contradicted their public statements. Plaintiffs claim, for example, that Defendants made statements about Nokia's business and the competitiveness of its products throughout the Class Period when they were aware that these "professed beliefs bore no resemblance to reality." (Pls.' Resp. 32) Plaintiffs allege that Defendants' conscious misbehavior is most pointedly evidenced by Ollila's post-Class Period admissions of inadequacies in Nokia's products, which demonstrate that since early 2003 Nokia's product portfolio was not competitive. (Pls.' Resp. 29)

Specifically, Plaintiffs believe that the best evidence of fraudulent intent are Ollila's April

63

6, 2004 statements and other statements thereafter, which Plaintiffs claim are admissions of his

knowledge during the Class Period that Nokia's product portfolio was lackluster.[13]  In particular,

Plaintiffs cite the April 6, 2004 conference call that Ollila had with analysts right after Nokia's

first quarter 2004 announcement that its net sales would fall below its previous projections.

During this call, Ollila answered an analyst's question about vulnerability in Nokia's product

portfolio by saying:[14]

> I think if we look at the particularly mid range, you know, we saw
> early on last year that what might be happening is that we are not
> fully competitive, so certainly we have started to take measures.
> *So if you now look at what is happening this year, we have*
> *launched seven new models and have started shipping five*
> *products that have – that were launched last year.  Most of them*
> *addressing the – the areas of vulnerability, as you said.*
>
> *They will be more phones coming to the market that will be*
> *launched in the second quarter as well as in the second half.  And*
> *all of those will have a meaningful impact during 2004.  With*
> *around 40 phones totally being launched, we expect that this will*
> *be a typical year in that respect.*  But in the early part of the year
> we will not be quite as competitive in those segments that we did –
> than we have been earlier and that we will feel that we will be
> towards the end of the year.  It's particularly GSM clam shell, mid-
> range classic and some of the high-end must have areas.
>
> (Am. Compl. ¶ 165; *see supra* Part I.B.12(b))

Plaintiffs interpret Ollila's April 6, 2004 statement to be an admission that he knew in

---

[13]These statements are quoted in full at *supra* Part I.B.12-19.

[14]Of concern to the Court, this is another instance where Plaintiffs again failed to include
Defendants' complete statement in the CAC.  It is disturbing that Plaintiffs did not find room in
their eighty-two-page CAC to include the full statements upon which they so heavily rely.
Defendants' statement is included here, in full, to provide context.  Portions of the statements
elided from the CAC by Plaintiffs are italicized.

early 2003 that Nokia was not competitive in either its mid-range or high-end phones and therefore Nokia's confidence in its projections during the Class Period were knowingly misguided.  (Pls.' Resp. 29)  This interpretation is not reasonable considering the entire context of the statement and the other statements included in the Consolidated Amended Complaint. First, taking the statement at face-value, it states that Nokia was aware in early 2003 that in *one* segment of its phone portfolio, mid-range phones, "what *might* be happening is that" Nokia was "not *fully* competitive."  (emphasis added)  Far from supporting Plaintiffs' allegations that Defendants knowingly misrepresented the strength of Nokia's product pipeline during the Class Period, Ollila's April 6 statement merely suggests that, at the time, there was *some* level of internal concern that a segment of Nokia's products were not as competitive as Nokia wished. Recognizing some prior concern over one segment of its product portfolio does not support an inference that Nokia's earlier projections for the company's broad product range were recklessly made in light of the information the speakers had at the time the projections were made.  Given the uncertainty inherent in contemporaneously predicting market trends and technological developments, a phenomena that Nokia warned its investors was difficult to gauge, Ollila's alleged admission of what *might* be happening was entirely consistent with his earlier public statements about Nokia's products.

Second, the April 6 statement also clearly notes that Nokia started to take measures to address "the areas of vulnerability" in their product line in 2003 and into 2004.  (Am. Compl. ¶ 165; *see supra* Part I.B.12(b))  Any reasonable reading of this statement must recognize that Ollila was suggesting that Nokia took action in 2003 to fix some of its problems and there would also be more phones introduced in the second half of 2004 to hopefully make Nokia even more

competitive in those areas.  Recognizing remedial action taken by Nokia during the Class Period is in no way an admission that Ollila's optimistic statements during the Class Period were false when made.  The opposite is true.  If Nokia had taken no corrective measure in early 2003 then Plaintiffs may have a more compelling argument that Nokia's positive statements later in 2003 were misleading because the company might have known otherwise.  Here, however, having tried to fix some of its problems, Nokia was well within reason to have an optimistic outlook about its new products.  The fact that, in retrospect, such optimism may have been too optimistic does not retroactively make its prior statements knowingly false, in particular when Defendants' wishful statements were not worded as guarantees.  See *In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *5 (finding alleged omissions of risks in projections not actionable because the defendants "gave no guarantees when the making the complained of statements").

Plaintiffs, however, do not stop there.  By Nokia's own admission, according to Plaintiffs, it takes Nokia twelve to eighteen months to develop new phones.  (Pls.' Resp. 29-30)  Therefore, Plaintiffs argue, Nokia must have been aware of its product shortfalls by late 2003 if it claimed it could remedy its inadequacies by late 2004 (as discussed in the April 6 statement).  (Pls.' Resp. 29-30)  Accordingly, say Plaintiffs, Nokia could have had no basis for optimism in late 2003 if its products were deemed to be not fully competitive at that time.  Yet, if Plaintiffs' assumptions are true, then any company that works on a somewhat lengthy production schedule would always be operating on a "non-competitive" basis.  Designing for what a company anticipates (based on demand and technology) cannot by implication mean that the company's current or past efforts are or were insufficient, or that optimistic statements about the company's current products are misleading because the company is planning something even better for the next product cycle.

Finally, even assuming, as Plaintiffs suggest, that Ollila's statement is an admission that he knew in early 2003 that Nokia had bottom-line changing product shortcomings, it is insufficient to create a "strong inference" of fraud. As long as Nokia's public statements were consistent with its reasonably available data at the time, Nokia's corporate officials were under no obligation to present an overly gloomy or cautious picture of current performance or future prospects. *See Novak*, 216 F.3d at 309; *see also Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 519 (S.D.N.Y. 2005), *aff'd*, 157 Fed.Appx. 398 (2d Cir. 2005). That Ollila "knew" in early 2003 that Nokia was not "*fully* competitive" *in its mid-range phones*, even if true, does not reasonably suggest that his positive statements about Nokia's overall product portfolio were said with the requisite extreme departure from the standards of ordinary care.

It is perfectly reasonable for Ollila to have known that Nokia had room for improvement in its mid-range phones in early 2003, but still feel positive about the viability of its overall product portfolio going forward in 2003 and 2004. *Cf. Rombach*, 355 F.3d at 174 ("[I]t is wholly unclear why data relating to four facilities can be deemed representative of [Defendant's] 115 other facilities, or material to the company's overall financial condition."). Further, there is no allegation in the CAC that Nokia had contrary facts suggesting its sales would drop to the level that they ultimately did. That the sales did later fall, however, does not make an earlier rosy prediction fraudulent other than by hindsight. *See In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir. 2003) ("A later statement may suggest that a defendant had contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement. However, it is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood." (quotations and

67

citation omitted)).

Besides Ollila's alleged admissions, Plaintiffs also allege scienter by the fact that the individual Defendants knew, or should have known, that they were misrepresenting material facts, based on their senior positions in the company, and by holding themselves out as knowledgeable about Nokia's products in presentations. (Pls.' Resp. 30-36) Such generalized allegations are insufficient, as a matter of law, to establish scienter. *See, e.g.*, *Kinsey v. Cendant*, No. 04 Civ. 0582, 2005 WL 1907678, at *5 (S.D.N.Y. Aug. 10, 2005) (collecting cases) (noting that "conclusory allegations that a corporate officer had 'access' to information that contradicted the alleged misstatements are insufficient to raise a strong inference of recklessness"); *In re Aegon N.V. Sec. Litig.*, No. 03 Civ. 0603, 2004 WL 1415973, at *17 (S.D.N.Y. June 23, 2004) (noting that recklessness cannot be alleged merely by stating that based on a defendant's position in a company it is likely he had access to unspecified materially adverse information).

Plaintiffs also allege scienter based on Ollila's admitted access to weekly reports, or "order books," that detailed Nokia's revenue and market share. Quoting portions of a January 22, 2004 conference call, Plaintiffs allege that Ollila and others at Nokia "received detailed sales information on a global and per country level in the course of Nokia's 'internal, bottom-up process' to support Nokia's internal planning and that they had 'exceptionally good visibility throughout the channel,'" and that Ollila himself "received 'reports weekly on revenue and on how we are doing against our competition and how our share is evolving.'" (Am. Compl. ¶ 187) Therefore, Plaintiffs contend, by the time of Ollila's March 25, 2004 comment to shareholders, when he said that he "strongly believed" that Nokia's product portfolio remained "very competitive," he had already received ten of the twelve weeks of sales data that should have been

68

sufficient to forecast Nokia's first quarter 2004 sales decline. (Pls.' Resp. 32) Thus, Plaintiffs

contend, Defendants' positive statements were recklessly made.

Scienter can be sufficiently pled when a complaint alleges that defendants were updated

on a regular basis about the facts upon which the falsity is alleged. *See, e.g.*, *In re Globalstar*

*Sec. Litig.*, No. 01 Civ. 1748, 2003 WL 22953163, at *7 (S.D.N.Y. Dec. 15, 2003) (finding

adequate support for scienter based on allegations that (1) the defendants were "updated on a

weekly basis with the number of Globalstar subscribers and the amount of minutes sold," (2)

confidential source statements, and (3) post-class period statements by the defendants).

However, Plaintiffs do not adequately plead with the requisite specificity, nor could they amend

their pleadings to show, when Defendants had the data to know its general optimistic statements

were false or recklessly made. *See In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d at 562

(finding that even if the individual defendants had reviewed the internal company documents

noting the flaws of the product, "such knowledge is insufficient to lead to an inference that the

speakers knew that the general and optimistic statements" about the commercial possibilities of

the product were untrue); *In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *10

(holding that the fact management had access to, and generally reviewed interim sales data does

not mean they would be aware that their predictions for the entire quarter would prove false).[15]

---

[15]Plaintiffs conceded at oral argument that access to the "order book" could not
reasonably suggest that Ollila knew when, if ever, his statements were overly optimistic.
(1/27/06 Tr. 77) ("[I]t is difficult, and I won't say that I can show it to you right now, because I
can't, all right, I can't tell you right now whether or not Mr. Ollila had the orders by January 22,
2004."). Instead, at argument, Plaintiffs fell back upon general conclusory allegations that Ollila
"had plenty of information about deficiencies in his product line in terms of not having
clamshells, of not having phones with high-resolution color, of not having mid-level and higher-
quality CDMA phones, of refusing operators' requests for customization . . . ." (1/27/06 Tr. 77)
Plaintiffs' conclusion that they personally "cannot imagine" that Ollila did not have the first

In fact, the record shows that Nokia's disappointing first quarter 2004 sales were, in substantial part, due to Nokia not fully exploiting its "usual seasonal market pick up in March." (Defs.' Ex. F 1)  As a result, the general allegations that Defendants received weekly reports on revenue amount to unsubstantiated speculation that Defendants knew their public statements were inaccurate at any point before its April 6 statement announcing its disappointing first quarter 2004 results.  Furthermore, the allegation that Defendants behaved recklessly because they knew about the poor first quarter 2004 results when they made positive projections is weakened by the early disclosure of the company's poor first quarter sales ten days before the deadline to file financial statements.[16]  Indeed, this early disclosure was more than what was required.  *See In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *5 ("[T]here is no obligation to release interim sales data prior to a quarter's end.").  Defendants were also under no duty to update the type of "vague statements of optimism or expressions of opinion" at issue here.  *See In re Int'l Bus. Mach. Corp. Sec. Litig.*, 163 F.3d at 110.  Accordingly, even when read in the light most favorable to Plaintiffs, the CAC's scienter allegations are insufficient to meet the standard of pleading conscious misbehavior or recklessness.  ___

---

quarter 2004 orders by March 25 (1/27/06 Tr. 77-78) is similarly insufficient to show what, if any, knowledge Ollila had at the time his statements were made about Nokia's first quarter sales.

[16]Plaintiffs argue this disclosure, "only" ten days before Nokia's financial statement was due, as compared to two months early in a previous Nokia case, *In re Nokia Corp. Sec. Litig.*, 1998 WL 150963, at *13 (finding voluntary early release of negative year-end data undercuts allegation defendants acted recklessly), should not negate an inference of scienter.  (Pls.' Resp. 38)  However, a statement ten days before a quarterly statement is not that different from a statement two months before an annual statement.  Moreover, since intent is the important factor in this analysis, regardless of how early it was announced, any early disclosure of negative results tends, at least to some degree, to disprove alleged recklessness.  *See Rombach*, 355 F.3d at 176 ("[T]he allegation that defendants behaved recklessly is weakened by their disclosure of certain financial problems prior to the deadline to file its financial statements.").

Because Plaintiffs have not sufficiently alleged motive let alone conscious misbehavior or recklessness, that can be attributed to Defendants, they have failed to adequately plead scienter, and thus, their claims under Section 10(b) and Rule 10b-5 must be dismissed.

### 4. Accounting Allegations

Plaintiffs initially attempted to state a claim for securities fraud based on Defendants' alleged improper accounting practices, (Am. Compl. ¶¶ 75-80) but later retreated from this claim in their Response.[17] Even as a securities fraud claim, however, this allegation fails. The alleged improper practices include: (1) delivery of phones with the understanding that unsold phones would be returned to Nokia; (2) billing customers while holding the goods on the shipping dock; (3) early shipment of products before year-end; and (4) intentional shipment of defective goods with the knowledge they would be returned. (Am. Compl. ¶¶ 75-80)

These allegations do not satisfy the requirement that in order to be material, a complaint alleging false financials "must contain allegations tending to demonstrate the materiality of the alleged overstatements in light of the defendant's total financial picture." *Gavish v. Revlon, Inc.*, No. 00 Civ. 7291, 2004 WL 2210269, at *16 (S.D.N.Y. Sept. 30, 2004) (citations omitted). Beyond alleging, with little support, that "millions of dollars worth" of two allegedly defective phone models were shipped to customers, (Am. Compl. ¶ 80) the CAC fails, and does not even attempt, to approximate the magnitude or degree of the alleged misstatements in relation to Nokia's total financial picture, a company with net sales over $37 billion. Such "conclusory

---

[17]Plaintiffs stated in a footnote in their Response that their serious accounting allegations were only offered, "at this time," to "buttress Plaintiffs' claims with respect to the lack of customer acceptance of Nokia['s] 'new' products, including the N-Gage, in 4Q03." (Pls.' Resp. 4 n.1)

allegations of materiality cannot withstand a motion to dismiss." *Id.* (citations omitted)

Further, "[a]llegations concerning GAAP violations, absent sufficient allegations of fraudulent intent, are not sufficient to properly allege scienter." *In re Labranche Sec. Litig*, No. 03 Civ. 8201, 2005 WL 3411771, at *26 (S.D.N.Y. Dec. 13, 2005) (citation omitted); *see also Gavish*, 2004 WL 2210269, at *19 ("[A] complaint's totally conclusory allegations regarding defendants' omniscient awareness of traffic into and out of the [sales] channel, are insufficiently particularized to support a strong inference of defendants' scienter." (citations omitted)).  Since no such intent or knowledge has been properly alleged here, as against the named defendants, the allegations concerning GAAP violations do not adequately plead scienter.

### C.  Leave to Amend

In the event that the Consolidated Amended Complaint is insufficiently pled, Plaintiffs requested leave to amend the CAC to plead additional facts from Nokia's 2004 Form 20-F and from Nokia's Fourth Quarter 2004 Earnings conference call (held in January 2005).  (Pls.' Resp. 6 n.3, 17 n.8)  Typically, leave to amend should be freely granted, *see* Fed. R. Civ. P. 15(a), however, given that Plaintiffs' request to amend is untimely, procedurally improper, and the proposed amendments would be futile, leave to amend must be denied.  *See Dluhos v. Floating & Abandoned Vessel, Known as N.Y.*, 162 F.3d 63, 69 (2d Cir. 1998) (recognizing liberal standard for granting leave to amend, "[n]onetheless a motion to amend should be denied if there is an 'apparent or declared reason – such as undue delay, bad faith or dilatory motive . . . , repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, [or] futility of amendment.'" (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962))); *Mackenworth v. S.S. American Merchant*, 28 F.3d 246, 251

(2d Cir. 1994) ("Although leave to amend shall be freely granted when justice requires, valid reasons for denying leave to amend include undue delay, bad faith or futility of the amendment." (citations omitted)).

While delay alone usually does not warrant denial of a request to amend, *see Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir. 2000) (noting that "'mere delay' is not of itself, sufficient to justify denial of a Rule 15(a) motion" (citation omitted)), it is one of the factors to be considered by the Court. *See In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 391 (S.D.N.Y. 2003), *aff'd on other grounds sub nom. Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) (leave to amend is properly denied when, *inter alia*, Plaintiffs wait until dismissal of their claims before requesting leave to amend). As in *In re Merrill Lynch*, Plaintiffs' first allusion to potentially amending their Consolidated Amended Complaint prior to the dismissal of the action was through footnotes in their opposition brief referring to the above-described documents. (*See* Pls.' Resp. 6 n.3, 17 n.8) However, Plaintiffs cannot "hedge their bets" by holding such evidence back in the hopes of having another bite of the proverbial apple when, especially after already amending the CAC once, they are surely aware of the correct procedure for a motion to amend their CAC. *See Merrill Lynch & Co.*, 273 F. Supp. 2d at 375 n.52.

However, even if timely, the proposed amendment should be denied as futile. Here, unlike many situations, the Court need not guess what alterations would be made to the Consolidated Amended Complaint, as Plaintiffs have identified the information they would rely on in amending the CAC. Specifically, if allowed to further amend the CAC, Plaintiffs contend that the 2004 Form 20-F would demonstrate the ten percent volume drop in Nokia's Fourth Quarter 2003 United States sales, thereby making Nokia's positive statements materially

misleading.  (Pls.' Resp. 17 n.8)  Plaintiffs would also add information from a January 2005 Earnings Call showing that Nokia maintained an "order book" for operator purchases on a quarterly basis to show that Defendants reasonably knew Nokia's projected sales three weeks into the quarter.  (Pls.' Resp. 6 n.3)  Plaintiffs also claim that the January 2005 Earnings Call further demonstrates Ollila's knowledge in 2003 of Nokia's "efficiency" and "effectiveness" problems that it "quietly worked on for quite a time."  (Pls.' Resp. 6 n.3)  As discussed *supra*, (*see* Part II.B.3) despite these additional potential pleadings, Plaintiffs conceded at oral argument that the order book could not substantiate what, if any, knowledge Ollila had in early 2004 concerning the lowered first quarter sales.  (1/27/06 Tr. 77)  When challenged, Plaintiffs fell back upon general conclusory allegations that by the January 22, 2004 earnings call Ollila had "plenty of information about deficiencies in [Nokia's] product line," and that surely Ollila knew of the drop in sales by the March 25, 2004 conference call.  (1/27/06 Tr. 77)

"In assessing whether proposed [amended] claims are futile . . . the court is required to adopt the same analysis as that applied on a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Thus, [the Court] must treat the facts alleged by plaintiff as true, and view them in the light most favorable to him."  *Olumuyiwa v. Harvard Prot. Corp.*, No. 98 Civ. 5110, 1999 WL 529553, at *5 (E.D.N.Y. July 21, 1999) (quotations and citations omitted).  Applying this standard here, Plaintiffs' putative second Amended Complaint would only include more of the same conclusory allegations that Defendants must have known its projections were overly rosy.  Thus, after reviewing the proposed likely amendments to the CAC, many of which were discussed during the lengthy oral argument, there is no indication that Plaintiffs' amendments could cure the CAC to establish

Defendants' scienter and therefore the proposed amendments would be futile. *See Chill v. General Electric Co.*, 101 F.3d 263, 272 (2d Cir. 1996) ("[F]utility is a good reason to deny leave to amend." (quotations and citation omitted)); *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) ("When the plaintiff has submitted a proposed amended complaint, the district judge may review that pleading for adequacy and need not allow its filing if it does not state a claim upon which relief can be granted."); *Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990) (affirming denial of leave to amend where "there is no merit in the proposed amendment."); *AEB & Assocs. Design Group, Inc. v. Tonka Corp.*, 853 F. Supp. 724, 735 (S.D.N.Y. 1994) ("[W]here a plaintiff is unable to allege any fact sufficient to support its proposed claim, leave should be denied." (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991))). Thus, in light of the fact that the CAC is both amended and consolidated, and that Plaintiffs have failed to show how any further changes to the CAC could cure the deficiencies presently in the CAC, Plaintiffs' request to amend the CAC is denied.

### D. Foreign Investors Claims

Defendants challenge the Court's subject matter jurisdiction over claims by foreign investors who purchased Nokia securities on foreign exchanges. (Mem. of Law in Support of Defs.' Mot. to Dismiss the Consolidated Am. Am. Compl. 37-40) Without deciding the question of law, and in light of the fact that the Court is dismissing the action without leave to amend, this claim is moot.

### E. Claims Against Individual Defendants

Plaintiffs also seek to hold individual Defendants Ollila, Pekka Ala-Pietila, Matti Alahuhta, Richard A. Simonson, Kallasvuo, and Vanjoki liable as "controlling persons" under

Section 20(a) of the Exchange Act. (*See* Am. Compl. ¶¶ 27-38, 207-210) Because Plaintiffs have failed to adequately allege a primary violation, namely a Section 10(b) or Rule 10-b(5) violation, their Section 20(a) claims must also fail. *See Kalnit v. Eichler*, 85 F. Supp. 2d 232, 246 (S.D.N.Y. 1999), *aff'd*, 264 F.3d 131 (2d Cir. 2001).

F. Rule 11

The PSLRA modified the application of Fed. R. Civ. P. 11(b) in private actions for securities fraud. Under 15 U.S.C. § 78u-4(c)(1), courts are required, "upon final adjudication of the action" to make specific Rule 11 findings. 15 U.S.C. § 78u-4(c)(1); *see also Rombach*, 355 F.3d. at 178 (remanding to the district court for failure to make Rule 11 findings). Plaintiffs claims were not frivolous and, therefore, the Court finds no basis to conclude that Plaintiffs or their counsel violated their obligations under Rule 11(b).

## III. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is GRANTED and the Consolidated Amended Complaint is dismissed.

SO ORDERED.

Dated:      March 31, 2006
                 New York, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

Service List:
Beth A. Kaswan, Esq.
Sanford P. Dumain, Esq.
Beth Parr, Esq.
Milberg, Weiss, Bershad & Schulman, LLP
One Penn Plaza
New York, N.Y. 10119
*Counsel for Plaintiffs*

Vincent R. Cappucci, Esq.
Entwistle & Cappucci, LLP
299 Park Avenue, 14th Floor
New York, N.Y. 10171
*Counsel for Plaintiffs*

Kenneth M. Kramer, Esq.
Jerome S. Fortinsky, Esq.
Seth M. Kean, Esq.
Nicole Coward, Esq.
Shearman & Sterling, LLP
599 Lexington Avenue
New York, N.Y.10022
*Counsel for Defendants*